**UNITED STATES of America, Appellee,**

v.

**Eduardo AROCENA, a/k/a "Omar," "Napoleon," "Andres," "Alejandro Medina," "Victor," Defendant-Appellant.**

No. 99, Docket 84–1390.

United States Court of Appeals, Second Circuit.

Submitted Sept. 19, 1985.

Decided Dec. 3, 1985.

Michael L. Tabak, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Stuart E. Abrams, Asst. U.S. Atty., New York City, of counsel), for appellee.

Richard B. Lind, New York City, for defendant-appellant.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

LUMBARD, Circuit Judge.

Eduardo Arocena appeals from a judgment of conviction in the Southern District on September 22, 1984, after a six-week jury trial. The jury found Arocena guilty on twenty-five counts, including first degree murder of a diplomat; two conspiracies to murder diplomats; malicious damage by explosives to property used in commerce, with personal injury resulting; six counts of possession of unregistered bombs; two counts of conspiracy; and perjury before the Grand Jury.[1] Judge Robert J. Ward sentenced Arocena on November 9, 1984, to serve consecutive sentences of life imprisonment and thirty-five years' imprisonment; Arocena is presently serving these sentences. Arocena argues on appeal that (1) he is entitled to a new trial on the murder-related counts of the indictment because of an allegedly defective jury instruction on the defense of withdrawal, (2) he was unfairly prejudiced by the joinder of Count 21 of the indictment, which charged him with violating RICO, and (3) the evidence was insufficient to convict him of three of the counts of the indictment, relating to the bombing of an Aeroflot Airlines ticket office in New York City. We find that Arocena's arguments are entirely devoid of merit.

Although this lengthy record of the criminal activities of the leader of a terrorist group raises no questions serious enough to require much discussion, the unusual nature and extent of the activities merit a published account. Arocena, an escapee from Castro's Cuba, was the kingpin in a secret terrorist organization comprised of exiles and emigres dedicated to overthrowing the Castro regime. This group, called "Omega 7," sought to carry out their mission through bombings and murders, crimes that they financed by assisting drug traffickers and through extortion. The Omega 7 activities were directed primarily by Arocena, as he detailed in his lengthy confessions to the FBI. Although Arocena repudiated these confessions at trial, and instead advanced fantastic stories of his alleged mistreatment by the Government, the case against him was heavily supported by tape-recorded conversations between Arocena and an FBI agent, by the testimony of eighty-five witnesses, and by other physical and forensic evidence.

From 1975 to 1982, Omega 7 conducted a series of bombings in the New York metropolitan area that injured bystanders and damaged homes, businesses, and a church. The bombsites included Avery Fisher Hall, Madison Square Garden, JFK Airport, the ticket office of Aeroflot (the Soviet airline), and the Cuban Mission to the United Nations. Omega 7 also engineered the machine-gun murders of Cuban exile Eulalio Jose Negrin and Felix Garcia, a Cuban diplomat, and attempted a car-bombing

---

1. The jury acquitted on Count 10, which charged Arocena with interstate transportation of explosives resulting in personal injury. After the trial and sentencing in the Southern District, Arocena was tried and convicted in the Southern District of Florida on all counts in two indictments, charging other crimes. On May 6, 1985, Arocena was sentenced to terms aggregating twenty years' imprisonment, to run consecutive to the terms imposed by Judge Ward.

murder of Raul Roa, another Cuban diplomat.

The FBI's first clue regarding the identities of the Omega 7 members came in 1980 when, within hours of an attempted bombing at the Cuban Consulate in Montreal, two Cuban exiles—Pedro Remon and Ramon Sanchez—were caught attempting to run the border back into the United States. The FBI knew Sanchez as an anti-Castro demonstrator from Miami. Upon investigation of Remon, the FBI learned that he had been arrested in New Jersey trying to break into a car and that he had shortly thereafter moved to Florida. Analysis of telephone records linked Remon with a longshoreman named Eduardo Arocena, who had also moved to Florida soon after the incident in New Jersey.

The FBI discovered that Arocena and Remon had rented cars at Newark Airport shortly before certain Omega 7 crimes, and that one of Arocena's cars had received a parking ticket across from the Cuban Mission on the day that Omega 7 murdered diplomat Felix Garcia. The FBI began physical surveillance of Remon, Arocena, and others, and also began court-authorized electronic surveillance of Arocena's home telephone and of Remon's car.

In September, 1981, Omega 7 bombed the Mexican Consulate in Manhattan. Arocena had rented a car at Newark Airport and had exchanged it shortly after the bombing, claiming that its brakes were defective. The FBI staked out the rental booth and saw Arocena return the replacement car and board the shuttle bus for the terminal. An FBI agent saw Arocena approach the ticket counter at Eastern Airlines and identify himself as "A. Medina," the alias used on his ticket.

In September, 1982, Arocena and other Omega 7 members were subpoenaed to testify before a Federal Grand Jury in the Southern District. None of the suspects was offered immunity, and all but Arocena pled the fifth amendment. Arocena, although he was repeatedly reminded of the penalties for perjury, denied throughout that he had used the alias "Alejandro Medi-

na," that he had any connection with Omega 7, and that he had any knowledge of Omega 7 other than what he had read in the newspapers.

Following Arocena's Grand Jury appearance, the FBI urged him to cooperate with the Government, emphasizing that he could have serious problems if he declined. Arocena finally agreed, and on September 24, 1982, he had the first of several meetings with the FBI. After being advised of his constitutional rights, Arocena began to explain that he was Omega 7's founder, commander-in-chief, and bomb-maker. He said that he had organized Omega 7 in 1974, when he decided that the anti-Castro movement in the United States was all talk; he believed that the Castro regime must be violently overthrown.

In his meetings with the FBI over the following days, Arocena displayed an encyclopedic knowledge of the Omega 7 bombings. He told the agents that the New Jersey branch of Omega 7 had disintegrated as a result of a falling-out between Arocena and Remon, and that Remon, Sanchez, and others had formed a new group in Miami. Arocena said that the Miami group had access to 600–800 pounds of high explosives, and that he wanted to help the FBI stop the bombings that were certain to occur. Justice Department officials decided not to arrest Arocena until after he had gone to Miami to try to locate the explosives. On September 27, 1982, Arocena and the agents went to Miami on separate planes, and over the next few days Arocena made additional admissions.

Among the crimes Arocena admitted was the murder of Eulalio Jose Negrin, a member of the "Committee of 75," which had negotiated the release of political prisoners from Cuba. Because Arocena opposed any kind of diplomatic dealings with Cuba, in November, 1979, he directed Remon to murder Negrin, which Remon did—with a machine gun, in broad daylight, and in front of Negrin's thirteen-year-old son. Arocena also planned, in March, 1980, to murder Raul Roa, Cuba's Ambassador to

the United Nations, by detonating a remote-controlled car bomb while Roa's car was on the FDR Drive. This plan failed, however, because the bomb fell off the car while Roa's chauffeur was parking.

Arocena also admitted having planned the September, 1980 murder of Felix Garcia, a diplomatic attache at the Cuban Mission. The plan called for Remon to drive a stolen car to the Mission and to execute Garcia and other diplomats, using the same machine gun he had used to kill Negrin. Arocena was to act as a back-up, riding in a rental car; he was supposed to pick up Remon after the murder was accomplished. Arocena claimed that he had attempted to call off this murder when Garcia arrived at the Mission without any other diplomats, and to this end had given Remon a "thumbs-down" signal from his car. According to Arocena, Remon gave him a contradictory "thumbs-up" signal, and drove away from Arocena's car. Later on that day, Remon machine-gunned Garcia to death.

Arocena told the FBI that, after the Garcia murder, Omega 7 planned the murder of Ramon Sanchez-Parodi, head of the Cuban Interests Section in Washington, D.C. On September 24, 1980, Arocena, Remon, and Eduardo Losada-Fernandez went to Belleville, New Jersey, to steal a car to use in the execution. Remon and Losada-Fernandez were caught stealing the car, however, and Arocena drove away to avoid arrest.

Arocena also admitted that he had committed numerous bombings. At midnight on December 28–29, 1978, he bombed Avery Fisher Hall to protest the booking of a Cuban performer. On March 25, 1979, Arocena and Remon placed a high-level explosive in a briefcase that they attempted to check aboard a TWA flight from JFK Airport to Los Angeles. Although Arocena claimed that this was merely a "scare tactic" to protest TWA's announcement of flight service to Cuba, the bomb did in fact explode on a baggage cart, causing extensive damage. On December 11, 1979, Arocena and other members of Omega 7

bombed the Soviet Mission to the United Nations, again causing substantial damage.

Arocena confessed that on January 13, 1980, he bombed the Padron Tobacco Company in Miami; on the same day, he ordered Remon and another Omega 7 member to place, at Aeroflot's 545 Fifth Avenue ticket office, a time-bomb that Arocena had built. Although Arocena approved of the execution of the Aeroflot bombing, he claimed to be upset that Remon had shot at a policeman who had given chase after the bomb exploded. On September 11, 1981, Arocena planted a bomb at the Mexican Consulate on 41st Street in Manhattan, while at the same time other Omega 7 members planted one of Arocena's homemade bombs at the Mexican Consulate in Miami.

Finally, Arocena admitted to the FBI agents that he had, indeed, used the alias "A. Medina" when travelling from New Jersey to Miami, and that his Grand Jury testimony to the contrary had been perjurious. On October 1, 1982, at the conclusion of the series of meetings, Arocena telephoned the agents and said that he had gone into hiding. He was a fugitive for almost ten months.

The Government continued to investigate Omega 7 before the Grand Jury. It called several Omega 7 members whom Arocena had identified, and directed them to testify pursuant to orders of statutory use immunity. When they refused to testify, they were held in civil, and later criminal, contempt. Several of Arocena's business associates from Miami did testify, however.

When Arocena learned of the Government's ongoing investigation, he made sporadic telephone calls from pay-phones to Agent Larry Wack of the FBI. Wack tape-recorded these conversations, and they were played at Arocena's trial. Arocena made many admissions during these calls, including his responsibility for two 1983 bombings that occurred just hours after Arocena discussed them. He added to his prior admissions about the attempted Roa murder, and said he still had the remote-control transmitter he built to detonate the

car-bomb. Arocena also gave more details about the Negrin and Garcia murders, and noted that the machine gun used in both crimes was "still around," but that the FBI wouldn't find Remon's fingerprints on it because he had worn gloves.

In these phone calls, Arocena also revealed to Wack that Omega 7 had financed its criminal activities by doing work for drug dealers. One of them, Manuel Fernandez, paid Omega 7 money to get even with an associate of his who had shot and robbed him; this mission was never accomplished, however. Fernandez also paid Omega 7 to collect unpaid drug debts, for which they received a 35% commission.

The FBI apprehended Arocena at his hideout in Miami's "Little Havana" district on July 22, 1983. Arocena's apartment contained an arsenal of unregistered and illegal weapons, including machine guns with silencers, semi-automatic pistols with silencers, rifles with silencers, and an assortment of knives. The FBI also found bomb components, including thirteen timing mechanisms used in the making of time-bombs, tools, and a bomb-making manual. The apartment also contained the remote-control transmitter that had been used in the attempt to murder Ambassador Roa, and a variety of Omega 7 stickers, stencils, and communiques. The search also revealed the wigs and false beards that Arocena had used to disguise his appearance while a fugitive.

While incarcerated, Arocena was unable to make rental payments on a large storage locker in Miami that he had rented under his alias "Alejandro Medina." The management of the warehouse, obviously unable to contact "Medina" for back rent, declared the locker abandoned and cut the lock. Upon viewing the contents of the locker, they called the police and the FBI. The FBI agents found in the storage locker an AR–15 rifle with a retractable stock and night scope, an Uzi semiautomatic weapon, a .22 caliber Luger with a silencer and scope, and two fragmentation grenades. The locker also contained Omega 7 stickers, newspaper articles about Omega 7

crimes, bomb manuals, surveillance files, and the list of persons who owed money to Manuel Fernandez. All of the above was entered into evidence at Arocena's trial.

The trial evidence also included testimony from four of Arocena's criminal associates. Drug-dealer Manuel Fernandez testified about the collection activities that Omega 7 performed for him, and about his hiring Arocena to kill Luis Fuentes, the drug associate who had shot and robbed Fernandez. This murder could not be consummated because Fuentes was discovered to be in jail. Fernandez testified that Omega 7 had agreed to murder another of his enemies, and had helped Fernandez escape when the police surrounded his house in 1982. According to Fernandez, Arocena personally had leaned on several drug customers who owed Fernandez money, and Omega 7 had been paid a total of $150,000 for these services. Although Arocena never managed to pass on to Fernandez any of the money owed him, he did give Fernandez two machine guns with silencers. Fernandez also testified that, to prove he was "el jefe" (the Chief) of Omega 7, Arocena had notified Fernandez before one of the Omega 7 bomb attacks; Arocena had used the code words "[T]here [is] going to be a party." Finally, Arocena discussed with Fernandez details of the Negrin and Garcia murders.

Maximiliano Lora, Fernandez's associate, also testified, pursuant to an immunity order. He corroborated Fernandez's testimony that Arocena had tried to find and kill Luis Fuentes, and that Arocena had given Fernandez the two machine guns with silencers. The jury also heard the testimony of Gerardo Necuze, an Omega 7 member, who admitted that he had been responsible for bombing the Mexican Consulate in Miami with a bomb Arocena had made, and that Arocena had been happy with the amount of damage the explosion had caused. Necuze also testified that Arocena had recruited him, in September, 1982, to bomb the Nicaraguan Consulate in Miami on the day Arocena was to appear before the Southern District Grand Jury. Necuze had helped Arocena go into hiding, had perjured himself before the Grand Jury in

1983, and had relayed to Arocena the questions asked before the Grand Jury.

Finally, the Government presented the testimony of Justo Rodriguez, a Cuban emigre. Arocena had taken Rodriguez along when he ordered weapons from one Milton Badia; the weapons included two AR–15 rifles, ammunition, camouflage uniforms, and assorted military field equipment. Rodriguez, in 1982, bombed the Venezuelan Consulate in Miami while Arocena testified before the Grand Jury, and was later thanked by Arocena. He also perjured himself before the Grand Jury to protect Arocena.

The defense consisted entirely of Arocena's own testimony, which flatly denied all wrongdoing. Arocena claimed that he had been the victim of a bizarre frame-up designed to protect the Castro regime, and denied any involvement with Omega 7. He explained his confessions to the FBI by claiming that the agents had kidnapped and drugged him. He claimed that the tapes of his telephone conversations with Agent Wack had been fabricated, but presented no evidence to show this. He denied having rented the storage locker in Miami, and suggested that the arsenal found in his hideout had been planted there by the FBI. Arocena conceded on cross-examination that he had signed numerous waiver of rights forms before confessing to the FBI in September, 1982. He also admitted that he had never mentioned the "kidnapping and drugging" in his many pretrial appearances before Magistrates and District Judges, and that he had intentionally lied in the Grand Jury when he denied having used the alias "Medina."

■ Arocena argues on appeal that he is entitled to a new trial on the murder-related counts of the indictment because of an allegedly defective jury instruction on the defense of withdrawal. Judge Ward's withdrawal charge, which applied to the Garcia murder,[2] essentially specified that a defendant must be acquitted of a conspiracy or crime if he withdraws from the conspiracy or crime before it is committed, and that the defendant "must act affirmatively to defeat or disavow the purpose of the conspiracy in order to withdraw from the conspiracy or crime." Arocena's argument on the withdrawal charge is without merit.[3]

■ First, Arocena has waived appellate review of this claim, because he never asked the district court to give any instruction on withdrawal and he failed to object to the charge that the court gave. *See* Fed.R.Crim.P. 30; *United States v. Wilkinson*, 754 F.2d 1427, 1432 (2d Cir.1985). It is evident that Arocena failed to request a charge on withdrawal or to object to the charge given because his defense throughout trial was that he had never had anything to do with Omega 7, and was merely caught in an elaborate frame-up. Judge Ward nonetheless instructed the jury that they could acquit if they found that Arocena had "withdrawn" from the conspiracy to murder Garcia; their guilty verdict demonstrated their belief that Arocena had not, in fact, done so. Second, Judge Ward's instruction on withdrawal was entirely cor-

---

**2.** Arocena asserts that the allegedly erroneous "withdrawal" charge should invalidate his conviction on Counts 1 (conspiracy to murder Ambassador Roa), 2 (attempt to murder Roa), 6 (conspiracy to murder attache Felix Garcia), and 7 (first-degree murder of Garcia). The challenged "withdrawal" charge applied, however, only to counts relating to the Garcia murder, a fact that Arocena's brief obscures. With respect to the attempted murder of Roa, Arocena claimed that he could have detonated the bomb even after it fell off the limousine, but decided not to for fear of harming children in a nearby parochial school. Accordingly, the charge as to the Roa counts included a discussion of "abandonment" or "renunciation," which was quite proper, and which the jury rejected.

**3.** Arocena's alleged "withdrawal" from the conspiracy to murder Garcia, which essentially consisted of a "thumbs-down" signal to demonstrate that the mission should be abandoned, is discussed more fully *supra*. Arocena also contends that the allegedly defective withdrawal instruction warrants a new trial on Count 7, which charged him with aiding and abetting Garcia's murder. This claim is meritless, because withdrawal is not a defense to the substantive crime of aiding and abetting a murder. *See United States v. Read*, 658 F.2d 1225, 1239–40 (7th Cir.1981).

rect, and certainly did not constitute "plain error." *See* Fed.R.Crim.P. 52(b); *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).

■ Arocena also claims that he was unfairly prejudiced by the joinder of Count 21 of the indictment with the remaining counts of the indictment. Count 21 charged Arocena with violating RICO. It alleged that, in conducting the affairs of Omega 7, Arocena and his co-racketeers conspired to commit murder, arson (including bombings), as well as other crimes, including extortion and dealings relating to narcotics, by which they could finance their terrorist activities.

According to Fed.R.Crim.P. 8, felony counts may be charged together if they "are of the same or similar character or [are based] on two or more acts or transactions connected together or constituting parts of a common scheme or plan." The RICO count clearly satisfied all three of these alternative tests for the propriety of joinder. It listed as predicate acts conspiracies to bomb the Mexican Consulates in New York and Miami, as well as several other targets. These acts were similar in character to bombing conspiracies charged in Counts 1 and 8 of the indictment, and substantive bombing acts charged in three other Counts. Moreover, because the bombing of the Mexican Consulate in Manhattan was both a predicate of the RICO Count and was the subject of Counts 22 and 24, the counts were properly joined as arising out of the same series of transactions. *See United States v. DePalma*, 461 F.Supp. 778, 787–90 (S.D.N.Y.1978).[4] Finally, the acts of violence that comprised the RICO count were part of a common scheme and plan that encompassed all the other violent acts charged in the indictment. *See, e.g., United States v. Gordon*, 655 F.2d 478, 484–85 (2d Cir.1981).

■ Arocena's claim that the joinder of Count 21 to the remaining counts in the indictment violated Fed.R.Crim.P. 14 is also meritless. A motion for severance under Rule 14 is addressed to the discretion of the trial court, *see Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), and the sound exercise of that discretion is "virtually unreviewable," *see United States v. Sotomayor*, 592 F.2d 1219, 1228 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). It is obvious that the district court properly exercised its discretion by refusing to sever Count 21.[5]

■ Arocena's final contention is that the evidence on Counts 9, 19, and 20 was insufficient. Counts 19 and 20 charged Arocena with aiding and abetting the bombing of the Aeroflot Airlines office in Manhattan, and aiding and abetting the receipt of the bomb used to destroy that office. Count 9 charged Arocena with bombing, or aiding and abetting the bombing of, the Cuban Mission to the United States in December, 1978. Because the evidence on all three counts was more than sufficient to justify the jury's verdict, Arocena's claims must fail.

With respect to Counts 19 and 20, the jury heard that Arocena himself had told the FBI agents in 1982 that he had made the bomb used to destroy the Aeroflot office, and that he had supervised the bombing. These admissions were corroborated by the testimony of a bystander witness. With respect to Count 9, the evidence again was sufficient. The jury heard that the Cuban Mission was bombed on the same night as was Avery Fisher Hall, and an anonymous caller to WCBS–AM Radio that night had linked the two bombings and said they both were the work of Omega 7. In

---

**4.** Arocena attempts to avoid this reasoning by creating a dichotomy between so-called "New York" and "Miami" conspiracies. The proof at trial demonstrated, however, that Omega 7 was a national operation, and therefore Arocena's attempted distinction has no merit.

**5.** Arocena does not contend that it was per se erroneous to join the RICO count with other

conspiracy counts. Nor does he contend that his consecutive sentences for the RICO count and the other conspiracy counts constitute cumulative punishment. *See, e.g., United States v. Thomas*, 757 F.2d 1359 (2d Cir.) (denying a similar challenge to consecutive sentences), *cert. denied*, —— U.S. ——, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

**950**

his interviews with the FBI, Arocena said that Remon had made this call, and admitted his responsibility for the bombing at Avery Fisher Hall. This view of the bombings is confirmed by admissions Arocena made during his phone conversations with Agent Wack of the FBI, as well as by the expert testimony of an FBI bomb expert, who linked manuals found in Arocena's locker to the type of bomb mechanisms found in the debris of the Cuban Mission. Thus, Arocena fails to meet the "very heavy burden" necessary to prevail on a claim of the insufficiency of the evidence. *See, e.g., United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).

Overall, the Government's case against Eduardo Arocena was overwhelming and impressive. Arocena's interviews with FBI agents and his lengthy taped conversations with Agent Wack, combined with the copious physical evidence against him and the testimony of eighty-five witnesses, piece together the details of a terrorist campaign shocking in its ferocity and persistence.

Affirmed.