**UNITED STATES of America, Plaintiff,**

**v.**

**Thompson B. SANDERS, Daniel Dewey, David Lee Pelleu and Daniel Kolton, Defendants.**

**No. 88 CR 104.**

United States District Court, N.D. Ill., E.D.

June 7, 1988.

**368**

James Conway, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Steven Senderowitz, Chicago, Ill., for Sanders.

Michael Pasano, Zuckerman Spaeder Taylor & Evans, Coral Gables, Fla., for Dewey.

Luis Galvan, Federal Defender Program, Chicago, Ill., for Pelleu.

Michael Sher, Chicago, Ill., for Kolton.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Currently before this Court is defendant Thompson Sanders' motion to dismiss the indictment. For the reasons stated below, that motion is denied.

### I.

The indictment sets forth a scheme in which Sanders and his three co-defendants engaged in fraudulent trading on the Chicago Board of Trade ("CBT"). The six-count indictment charges Sanders with one count of conspiracy, one count of wire fraud and four counts of false representation in violation of the Commodity Exchange Act ("CEA"). Sanders and his co-defendants devised a scheme wherein they could engage in "risk free" trading. By utilizing stolen, bogus and counterfeit CBT trading jackets and identification credentials and with the help of wigs and make-up, the conspirators made risk-free trades on the floor of the CBT.

### A.

Proper commodity trading on the floor of the CBT proceeds in the following manner. In order to enter into a trading contract, one must open and maintain a margin account with a Futures Commission Merchant ("FCM"). A FCM is a corporation which accepts orders for the purchase of commodities for future delivery. Margin is money or other property of value which a customer is required to deposit into a commodity trading account as earnest money to demonstrate their good faith that they will pay any losses incurred as a result of entering into commodity futures trades and

to ensure future performance on commodity futures trades by customers.

All commodity trading at the CBT is done in a restricted trading area which is closed to the public. Access to this area is restricted by CBT rules to authorized CBT members and employees. Trading on the floor of the CBT is conducted by floor brokers who execute trades on behalf of their customers. When a floor broker enters into a contract to buy or sell a particular commodity with another floor broker, the brokers must record the transaction on a trading card or endorse an order listing certain information material to the trade such as the commodity traded, the trading price, the time of the trade, the name of the opposite broker and his member firm. After the brokers fill out the trading cards, the cards are delivered to the brokerage firms employing the respective brokers.

After receiving the trading cards, the information listed by the floor brokers on the cards is entered into the computer records of the clearing house for the CBT. At the end of the trading day, the clearing house for the CBT matches up various buy and sell commodity trades for that day based upon the information initially listed by the floor brokers on the trading cards and subsequently entered into the computer records of the clearing house.

After the clearing house has finished matching up trades, the brokerage firms receive from the clearing house a record of that day's trading activity involving that firm. Based upon this record, the brokerage firm will determine whether to issue a margin call to a customer, that is, a request that the customer deposit additional money into the margin account due to trading losses sustained or trading positions assumed by the customer during that trading day.

### B.

It is charged in sum that beginning in May 1986, Sanders and his three co-defendants hatched a plan to fraudulently engage in "risk-free" trading on the CBT. Defendants Sanders and David Pelleu did "steal, obtain and create false, bogus and counterfeit" CBT trading jackets and identification credentials. These items were used by defendants Daniel Dewey and Daniel Kolton to enter restricted CBT trading areas. Dewey would also wear wigs and cosmetic make-up to alter his physical appearance. Dewey would enter the trading area in disguise with bogus identification and trading jackets and would then place orders to buy or sell Treasury Bond commodities with various floor brokers. Dewey would then transfer the trading cards for the trades to Sanders.

Sanders and the others would then determine whether the trades had been profitable or whether there had been a loss. If the trades placed by Dewey turned out to be profitable, the defendants would claim the trade and take the profits. But if the trades lost money, the defendants would not claim the trade. Because these trades had been executed with bogus credentials and while in disguises, the losing commodity trades placed by this conspiracy could not be traced. Thus, the government charges that defendants created a way to engage in truly risk-free trading, only at the expense of the other floor broker's customers.

### II.

Sanders raises three grounds for dismissal of the indictment. First, he argues that Counts 3 through 6, which charge false representation in violation of the CEA, fail to state an offense. Secondly, he argues that Counts 1 and 2 for conspiracy and wire fraud should be dismissed because the phone call upon which these are based cannot support the charges. Finally, he contends the indictment is impermissibly vague and must be dismissed. For the reasons set forth below, we deny Sanders' motion to dismiss.

### A.

The indictment charges in Counts 3 through 6 a violation of 7 U.S.C. § 6h which, when combined with the penalty sections of the CEA, 7 U.S.C. § 13(b), makes it a felony for any person to misrepresent himself as a member of a contract market

in "handling" or "soliciting" a futures contract order. 7 U.S.C. § 6h states:

> § 6h. False self-representation as contract market member prohibited.
>
> It shall be unlawful for any person falsely to represent such person to be a member of a contract market or the representative or agent of such member, or to be a registrant under this chapter or the representative or agent of any registrant, in soliciting or handling any order or contract for the purchase or sale of any commodity in interstate commerce or for future delivery, or falsely to represent in connection with the handling of any such order or contract that the same is to be or has been executed on, or by or through a member of, any contract market.

■ Sanders contends that this section, *unambiguously,* makes it only unlawful to defraud *public customers* in the "solicitation" and "handling" of their futures contract orders and not the defrauding of commodity traders and brokers as is alleged in the indictment.[1] The government agrees that the statute is unambiguous, but finds Sanders' interpretation "narrow and misguided." The government fails to read any limitation in § 6h to prohibit misrepresentations only to public customers. We agree with the government that there is no limitation in § 6h to misrepresentations made only to public customers.

Section 6h contains a blanket prohibition on false representations made by "any person" in "soliciting" or "handling any order." 7 U.S.C. § 6h. There is absolutely

no indication that the prohibition only applies to "soliciting" or "handling" a *customer's order.* We are fortified in this conclusion by our examination of other sections of the CEA. The argument that 7 U.S.C. § 6h only prohibits misrepresentations to customers is refuted by the language of 7 U.S.C. § 6o. The former section speaks broadly in terms of prohibiting *"any* person" from falsely representing himself in the soliciting or handling of *"any* order or contract." 7 U.S.C. § 6h. The latter section makes it unlawful to employ a scheme to defraud "any client or participant or prospective client or participant," or to engage in any transaction, which operates as a fraud upon "any client or participant or *prospective client or participant."* 7 U.S.C. § 6o. "[W]here Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972).[2] Had Congress intended to restrict § 6h to only prohibit misrepresentations made to "customers" as Sanders contends, it presumably would have done so expressly as it did in § 6o.

Having concluded that the language itself does not express a limitation to false representations made solely to "customers," we examine the legislative history of § 6h to determine if indeed such a limitation was intended. We observe, however, that we can only ignore the language of the statute itself if there is a *clear legislative intention to the contrary.* "[S]tatutory construction 'must begin with the language of the statute itself,' and '[a]bsent a

---

1. Sanders stated in his memorandum in support "criminal statutes are to be strictly construed and any ambiguities should be resolved in favor of lenity." Then in his reply he states "[T]he government erroneously states in its answer that Sanders 'suggests the statute is ambiguous.' To the contrary, Sanders argued in his memoranda that the statute is entirely unambiguous. It only applies to defrauding customers." (Reply at 1). Because the statute is unambiguous, by defendant's own admission, the rule of lenity does not apply. "That rule 'comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrong-doers.'" *Russello v. United States,* 464 U.S. 16, 29, 104 S.Ct. 296, 303, 78 L.Ed.2d 17

(1983) (citations omitted). *Accord* N. Singer, *Southerland Statutory Construction* § 59.03 (Sands 4th ed. 1986) ("the rule of lenity should only be applied if after reviewing all sources of legislative intent the statute still remains ambiguous").

2. Although the original versions of § 6h and § 6o were added to the CEA at different times, § 6h in 1936, 49 Stat. 1496 and § 6o in 1974, 88 Stat. 1399, their current versions were amended together in 1983, Pub. L. 97–444, Title II, § 210 and § 214, 96 Stat. 2302, 2305. Therefore, we think the general rule that we must presume Congress intended the exclusion of any limiting language is still applicable.

clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Bread Political Action Committee v. FEC*, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237–38, 71 L.Ed. 2d 432 (1982) (citations omitted).

The current § 6h was originally passed in 1936 as § 6h(2). Commodity Exchange Act, ch. 545, 49 Stat. 1491, 1496 (1936). In 1982, it was amended, and the previous § 6h(1) was incorporated into another section, and the old § 6h(2) was relabeled to the present § 6h. Futures Trading Act of 1982, § 210, 96 Stat. 2294, 2302 (1983) (codified as amended at 7 U.S.C. § 6h) (West Supp. 1988). In support of his argument, Sanders contends that the legislative history of the CEA clearly evinces an intent that the prohibition on § 6h apply only to misrepresentations made to customers. He sets forth isolated references to the need to protect the public in the Senate and House Reports discussing the 1936 Act and in the public hearings conducted prior to its passage. However, none of the sections he cites refer to § 6h in particular. The only specific reference we could locate in either the House or Senate Report to § 6h was in the House Report. It stated the following:

> Section [6]h(1) prohibits operation of a place of business where orders for futures contracts are solicited or accepted unless such orders are to be executed by or through a member of a contract market. Paragraph 2 [the current 6h] of the section prohibits misrepresentation by any person that he is a member of a contract market, or a registered futures commission merchant, or an agent of either, in connection with contracts for the purchase or sale of commodities in interstate commerce or for future delivery, or that the order is to be or has been executed on, or by or through a member of, a contract market.

H.R.Rep. No. 421, 74th Cong., 1st Sess. at 6 (1935). Thus, contrary to Sanders' position, there is no *clearly expressed* congressional intent that § 6h apply only to misrepresentations made to customers.[3]

Finally, even if there were such a limitation, it would be satisfied in this case. The misrepresentation charged in the indictment occurred when Daniel Dewey, falsely dressed and bearing identification as a floor broker, executed trades on the floor of the CBT with a legitimate floor broker who was led to believe the disguised Dewey was also a legitimate floor broker. The CEA defines a floor broker as "any person who, in or surrounding any 'pit,' 'ring,' 'post,' or other place provided by a contract market for the meeting of persons similarly engaged, shall *purchase or sell for any other person* any commodity for future delivery on or subject to the rules of any contract market." 7 U.S.C. § 2 (emphasis added). Thus, a floor broker is merely a conduit for a customer. Therefore, when Dewey falsely pretended to be a legitimate floor broker, he was in essence falsely representing himself to the customer upon whose behalf the duped floor broker made the trade. Accordingly, even if we found that § 6h was limited to a situation where the false representation is made to a *"customer,"* we would conclude that the indictment makes such an allegation.

### B.

Sanders challenges the sufficiency of Count II for wire fraud and Count I which charges a conspiracy to commit wire fraud. First, he contends the interstate phone call upon which Count II is based was not in furtherance of the scheme to defraud. Secondly, he argues that the call only occurred after the scheme came to fruition.

A legally-sufficient indictment should state all elements of the offense charged,

---

**3.** We do not also claim to have read all 288 pages of the Senate hearings on the CEA in 1936, *To Amend the Grain Futures Act: Hearings on H.R. 6772 Before the Senate Committee on Agriculture and Forestry*, 74th Cong., 2d Sess. (1936), because ordinarily such testimony should not be accorded undue weight as an indication of legislative intent since the views expressed by witnesses at congressional hearings are not necessarily the same as those of the legislators ultimately voting on the bill. *Austasia Intermodal Lines v. Federal Maritime Comm'n*, 580 F.2d 642, 645 (D.C. Cir.1978). We did, however, skim over the hearings, and we did not find any specific references to § 6h.

inform the defendant of the nature of the charge so that he may prepare a defense and enable the defendant to plead the resulting judgment as a bar to any later prosecution for the same offense. *United States v. Gironda,* 758 F.2d 1201, 1209 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). The elements of wire fraud under 18 U.S.C. § 1343 are (1) that defendants devised a scheme to defraud and (2) that they made use of an interstate wire in furtherance of the scheme. *United States v. Mueller,* 786 F.2d 293, 295 (7th Cir.1986).

■ A review of Count II as set forth in the indictment reveals that all of the elements of wire fraud are alleged. The indictment alleges that the defendants devised and intended "to devise a scheme to defraud and obtain money in an amount of approximately $200,000 by means of false and fraudulent pretenses, representations" and "for the purpose of executing such scheme and attempting so to do, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds, namely, telephone calls between defendant Thompson B. Sanders in Chicago, Illinois, and defendant Daniel Dewey in Hendersonville, North Carolina, in violation of Title 18, United States Code, Sections 1343 and 2." (¶ 3a).

In order to show that the telephone call made by the defendants was not in furtherance of the scheme to defraud, Sanders attaches an FBI report which Sanders claims shows the government's evidence does not support the indictment. In effect, Sanders rather than challenging the *sufficiency of the indictment* is seeking to challenge the *sufficiency of the government's evidence* prior to trial. At the motion to dismiss the indictment stage, however, we cannot decide as a matter of law something which turns on the specific facts of this case. The testimony at trial may be precisely the same as the FBI report. Then again, it may not. In any event, an indictment sufficient on its face cannot be successfully challenged on the basis that the government may not meet its burden of proof. For this reason, we deny the motion to dismiss the indictment on this basis.

Sanders next argues that the "government has absolutely no proof nor can it represent it has any proof relating to these phone conversations (which does not include the October 3, 1986 call) as being relevant to the conspiracy." (Memo in Support at 14). Again, as stated above, a motion to dismiss is not the proper place to challenge the sufficiency of the *government's evidence.*

### C.

Finally, Sanders argues that the indictment is impermissibly vague. We disagree. The indictment states all the elements of the offenses charged, informs the defendants of the nature of the charge so that they can prepare a defense and plead the resulting judgment as a bar to any later prosecution for the same offenses. *United States v. Gironda,* 758 F.2d 1201, 1209 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). We agree with the government that Sanders seems to be suggesting factual "assertions or prosecutive theories ... in order to have the government either adopt or deny them." Accordingly, we deny Sanders' last grounds for dismissal.

———

In conclusion, we find the indictment correctly charges the crime of misrepresentation under 7 U.S.C. § 6h and 13(a). It also correctly charges the offenses of conspiracy and of wire fraud under 18 U.S.C. § 1343. Finally, the indictment is not impermissably vague. Accordingly, Sanders' motion to dismiss the indictment is denied. It is so ordered.