**UNITED STATES of America, Plaintiff,**

v.

**Alfred ELLIOTT, Defendant.**

**No. 88 CR 645.**

United States District Court,
N.D. Illinois, E.D.

March 31, 1989.

Kristina Anderson, Larry Rosenthal, Assistant U.S. Attys., Chicago, Ill., for plaintiff.

Alfred Elliott, Overland Park, Kan., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The defendant Alfred Elliott has moved to strike and dismiss certain parts of the indictment against him. For the reasons set forth below, that motion is denied.

### I. *Background*

The seventy-count indictment charges that Elliott, a former partner in the law firm of Schiff, Hardin & Waite ("Schiff"), misused "confidential client information" for his personal benefit in nine separate transactions involving Schiff clients. According to the indictment, when Elliott would learn confidential information about the planned acquisition of a large block of stock, he used this "nonpublic information"

and purchased stock in the target company, in the expectation that the price would rise when the planned acquisition became public. The stock purchases purportedly were made through the Chicago office of Charles Schwab & Co., which communicated the orders by wire to a central computer in San Francisco. The indictment charges that by purchasing these stocks, Elliott defrauded both Schiff, *see* Indictment Ct. 1, ¶ 2(a), and its clients, *see id.* ¶ 2(b), of property, namely, the confidential client information. Since the purchases were made by wire, the indictment charges Elliott with thirty-four counts of wire fraud, 18 U.S.C. § 1343 (1982), for each of the separate wire communications. In addition, because the fraud was in connection with the purchase of securities, the indictment charges Elliott with thirty-four counts of securities fraud, 15 U.S.C. §§ 78j(b), 78ff (1982 & Supp. IV 1986), for the same transactions. Count 69 of the indictment charges Elliott with a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1963(a) (1982 & Supp. IV 1986), and Count 70 charges Elliott with filing a false income tax return, 26 U.S.C. § 7206(1) (1982). The tax count is not at issue in this motion.

## II. *Wire Fraud*

### A. Was the Confidential Client Information "Property" in the Hands of Schiff?

■ Paragraph 2(a) of Count 1, adopted by reference in every other count but number 70, alleges that Elliott defrauded Schiff "of property, namely, confidential information which defendant ALFRED ELLIOTT misappropriated and used for his own private benefit." Elliott contends that paragraph 2(a) is a *non sequitur* and will not support a charge under the wire fraud statute. His argument goes like this: (1) The wire fraud statute protects only property rights. *See Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). (2) An essential ingredient of property is the ability to exploit it. (3) It is the government's theory that the Illinois Code of Pro-

fessional Responsibility as well as Schiff's own policies prohibit a lawyer from using confidential client information for personal gain, without the client's consent. (4) Therefore, Schiff could not exploit the client confidences. (5) Therefore, Schiff had no property interest in the confidential client information. (6) Therefore, even if Elliott defrauded Schiff of confidential client information, he did not defraud them of property. (7) Therefore, paragraph 2(a) does not state a violation of the wire fraud statute.

Elliott relies heavily on certain language from *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), in support of his argument. In *Carpenter,* one of the defendants, a reporter for *The Wall Street Journal's* "Heard on the Street" column, used his knowledge of what would be published in the column to buy or sell stock, in the expectation that the stock's price would go up or down when the column was published. The Supreme Court held that this prepublication information, even though intangible, was property for purposes of the mail and wire fraud statutes. The Court stated:

> The Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the "Heard" columns.... The confidential information was generated from the business and the business had a right to decide how to use it prior to disclosing it to the public.... [I]t is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter.

*Id.* 108 S.Ct. at 320–21. Elliott argues that since Schiff did not have a right to decide how to use the client confidences or a right to exclusive use of these confidences, they were not property interests in the hands of Schiff.

The Second Circuit has already rejected the same argument in *United States v. Grossman,* 843 F.2d 78 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 864, 102

L.Ed.2d 988 (1989). In *Grossman,* the defendant, an associate of a New York City law firm, funneled information about the recapitalization of a firm client to his friends and relatives, who profited handsomely from the information. Grossman argued, as Elliott argues here, that in light of *Carpenter,* the confidential information was not property in the hands of the law firm, since the firm could not exploit it. The Second Circuit rejected this argument as "specious," for two reasons:

> First, Grossman distorts *Carpenter.* In context, the language which he cites merely *describes* the confidential information in that case; it does not require that *all* confidential information must be of the same nature to be considered "property." *Carpenter* actually holds generally that, even though "confidential business information" is intangible, it "has long been recognized as property." Thus, the information in this case regarding the ... recapitalization clearly falls within the definition of property under *Carpenter.* Second, the fact that [the law firm] could not commercially exploit the information by trading on it does not mean the confidentiality of the information had no commercial value to the firm. As several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients.

*Id.* at 86.

Elliott contends that *Grossman* is wrongly decided; in his view, the Second Circuit, by looking to the firm's reputation, readopted the intangible rights theory rejected in *McNally.* However, we believe that the Seventh Circuit implicitly endorsed the *Grossman* decision in *FMC Corp. v. Boesky,* 852 F.2d 981 (7th Cir.1988). In that case, FMC alleged that Boesky, the famed arbitrageur gone bad, purchased a large block of FMC stock after learning inside information about FMC's recapitalization, and thus raised the cost of recapitalization substantially. The narrow issue on appeal was whether FMC had been injured for purposes of standing under Article III of the Constitution. Reversing the district court, the majority held that FMC had suffered an injury to its property. Judge Manion, dissenting, disagreed. Judge Manion suggested that an injury to reputation would suffice, but there was no such injury alleged. To illustrate his point, Judge Manion cited to *Grossman* with a *"Cf."* In responding to Judge Manion's contention, the majority also cited *Grossman,* but argued that Judge Manion's citation of the case was anomalous.

> On the one hand, he argues that under *Carpenter,* FMC's confidential business information was so ethereal to be "property" for purposes of federal mail fraud and could not be the subject of an Article III injury because it was not the company's stock-in-trade and lacked commercial value. On the other hand, his reading of *Grossman* suggests that the same confidential information in the hands of FMC's law firm or Goldman was "property" for purposes of mail fraud and, because it would have commercial value—certainly both FMC's law firm and Goldman also had a reputational interest in keeping the information confidential—its misappropriation would suffice for purposes of an Article III inquiry. Under this reasoning, Goldman could bring a civil action against Brown and Boesky and friends, but FMC, the actual owner of the information, could not. This seems a strange result.

*Id.* at 992 n. 21. We read this passage to mean that the majority believes confidential corporate information should be considered property in the hands of the corporation itself—which is essentially what it held—but also in the hands of the corporation's law firm or investment banker. To be sure, the references to property under the mail fraud statute are only dicta, since the issue before the Court was standing under Article III; the Court conceded that the inquiries were different under the statute and the Constitution. *Id.* at 991 n. 21. But the import of the quoted passage is that a corporation's confidential informa-

tion is still property in the hands of the corporation's law firm.

But even if we are wrong and the Seventh Circuit has not endorsed *Grossman*, we still believe that the confidential client information must be considered Schiff's property for purposes of the mail fraud statute. Certainly, the Illinois Code of Professional Responsibility strictly limits how a law firm can use the confidences of its clients, that does not mean, however, that a law firm does not or cannot use client confidences. On the contrary, the law firm uses such confidences all the time, to produce the legal advice and other forms of legal assistance that it sells. Client confidences therefore have economic value to a law firm, just as a word processor or a copying machine or any other tool used by a law firm does. Moreover, the Seventh Circuit has suggested, albeit in passing and without discussion of the issue, that a person still has a property interest in money which is held for the benefit of others and whose use is limited by law. For example, in *United States v. Cosentino*, 869 F.2d 301 (7th Cir.1989), the defendants were charged with withdrawing funds for their personal use from the account of an insurance company, whose funds were strictly regulated in order to protect policyholders. The Court concluded that the indictment alleged "a scheme to deprive [the insurance company] and its policyholders of money, thus stating an offense under" the mail fraud statute. *Id.* at 310. Likewise, in *United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir.1988), *cert. denied sub nom. Ticktin v. United States*, — U.S. —, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989), the court stated that a "scheme to injure [a federally insured and regulated savings and loan] financially is necessarily one to injure its shareholders and depositers [sic] financially." The same logic should apply to client confidences, since they are held for the benefit of the client and since their use is also limited by law. We therefore reject Elliott's argument on this point and hold that client confidences must be considered property not only in the hands of the client but also in the hands of the law firm.

**B. Does the Indictment Sufficiently Allege that Elliott Defrauded Schiff and Its Clients of Confidential Information?**

■ Paragraph 2(b) of Count 1 alleges that Elliott defrauded Schiff's clients "of property, namely confidential client information which defendant ALFRED ELLIOTT misappropriated and used for his own private benefit." Elliott does not contest—wisely, in light of *Carpenter*—that confidential client information is the client's property. Nonetheless, he argues that paragraph 2(b) must be stricken because the rest of the indictment does not support the claim that he took confidential client information.[1]

Elliott notes that the paragraphs describing his purchases of stock do not explicitly state that he purchased stock based on confidential information. Rather, they state that he purchased stock "on the basis of nonpublic information he learned during the course of confidential conversations." *See, e.g.*, Indictment Ct. 1, ¶¶ 7, 9, 11. Elliott argues that "nonpublic" is not the same as "confidential," and that even if he learned of information during confidential conversations, that does not mean the information was still confidential when he allegedly misappropriated it by purchasing stock.

Elliott's argument must be rejected. In evaluating the sufficiency of an indictment, we must look to three factors: "First, it should state all of the elements of the offense charged; second, it should inform the defendant of the nature of the charge so that he may prepare a defense; and third, it must enable the defendant to plead the judgment as a bar to any later prosecution for the same offense." *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.), *cert. denied sub nom. Spiess v. United States*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985); *see also United States v. Serola*, 767 F.2d 364, 369 (7th Cir.1985);

---

1. As Elliott appears to recognize, if we were to accept his argument on this point, we would also be required to strike paragraph 2(a), discussed above in Section II.A.

*United States v. Sanders,* 688 F.Supp. 367, 371–72 (N.D.Ill.1988). Essentially, Elliott is arguing that the indictment fails the first prong of this test, since the indictment does not state that he defrauded Schiff and its client of confidential information, but only of nonpublic information. However, we refrain from reading an indictment in a hypertechnical fashion. *Gironda,* 758 F.2d at 1209. The Seventh Circuit has held that mail fraud indictments in particular should be accorded a broad reading, *United States v. Brack,* 747 F.2d 1142, 1147 (7th Cir. 1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985); given the similarities between the mail and wire fraud statutes, *see Carpenter,* 108 S.Ct. at 320 n. 6; *United States v. Gimbel,* 830 F.2d 621, 627 (7th Cir.1987), wire fraud indictments like Elliott's must also be broadly construed. With these principles in mind, we conclude that stock purchased "on the basis of nonpublic information ... learned during the course of confidential conversations" is equivalent to stock purchased on the basis of confidential information.

Moreover, even if we were to accept Elliott's strained reading of paragraphs describing his purchases, the indictment still must be read as a whole. *United States v. Hoag,* 823 F.2d 1123, 1126 (7th Cir.1987); *United States v. Watkins,* 709 F.2d 475, 478 (7th Cir.1983). Any defects in the individual paragraphs are cured by paragraph 3, which describes Elliott's scheme in general.[2] Paragraph 3 reads in pertinent part as follows:

> It was the scheme of defendant ALFRED ELLIOTT to purchase stock based on confidential client information that he learned during the course of his work at Schiff, Hardin & Waite. When *confidential information* was disclosed to defendant ALFRED ELLIOTT by other attorneys at the firm or by clients of the firm which related to a prospective acquisition of a large block of stock, defendant ALFRED ELLIOTT, acting on the basis of this *nonpublic information,*

would purchase stock in the corporation which was to be the target of this acquisition, expecting that the price of this stock would later rise when the prospective acquisition became public. In this way, defendant ALFRED ELLIOTT schemed to reap large profits by utilizing *non-public, confidential* information....

(Emphasis added.) The underlined passages make it clear that the scheme alleged was one to purchase stock based on confidential client information, and that "nonpublic information" is intended to mean "confidential information." The allegations sufficiently charge that Elliott defrauded Schiff and its clients of the clients' confidential information, and we reject Elliott's arguments to the contrary.

### C. Does the Indictment Sufficiently Allege That the Confidential Client Information was Material?

■ Elliott also argues that the wire fraud allegations are deficient because they fail to allege that the confidential information allegedly misappropriated was material. The government concedes that the indictment does not use the word "material," and that the "nonpublic information must have been of some importance to both Elliott and the victims of the fraud to constitute property." Govt's Response at 9. The government does argue, however, that the indictment clearly alleges the significance of the confidential information.

We agree. "In determining whether an essential element is missing from the indictment, [the Seventh Circuit] has held that no particular words or phrases must be used." *Watkins,* 709 F.2d at 478. Thus, an indictment that charged a defendant with knowingly making false statements for the purpose of obtaining HUD-insured mortgages, in violation of 18 U.S.C. § 1010 (1982), was sufficient even though it did not explicitly allege "materiality"; the Seventh Circuit held that materiality is not

---

2. Even though it is usually stated that the indictment should be read as a whole, there is precedent to suggest that each count of the indictment must be read separately, and that allegations in one count will not cure defects in another. *Gironda,* 758 F.2d at 1209, 1210. Even if that is the law, our analysis here only involves a separate paragraph in the same count.

required under § 1010, but alternatively that materiality was alleged in substance, since the defendant must have known HUD would rely on his false statements. *Hoag,* 823 F.2d at 1125–26. The indictment against Elliott similarly alleges materiality in substance. Paragraph 3 states that Elliott bought stock in companies he knew were targeted for acquisition, in the expectation that the price of the stock would rise when the acquisition became public. If the price of the stock was expected to rise when information about the acquisition became public, that information must have had some significance or, to use Elliott's word, must have been "material." We reject Elliott's arguments on this point also and conclude that the wire fraud allegations should stand.

### III. *Securities Fraud*

#### A. The Misappropriation Theory

■ Elliott is also charged with thirty-four violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
>    *    *    *    *    *    *
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

In 1942, pursuant to section 10(b), the Securities and Exchange Commission promulgated Rule 10b–5, 17 C.F.R. § 240.10b–5 (1987), which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

The second paragraph of each securities fraud count tracks the language of parts (a) and (c) of Rule 10b–5 and alleges that Elliott, by placing orders for stock, "employed a device, scheme and artifice to defraud and engaged in acts, practices and a course of business that operated as a fraud."

In most insider trading cases under section 10(b) and Rule 10b–5, the focus has been on whether a corporate insider or his "tippee" breached a duty to disclose material nonpublic information before buying or selling stock. *See Dirks v. Securities & Exchange Commission,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *In re Cady, Roberts & Co.,* 40 S.E.C. 907 (1961). However, the government does not rely on these nondisclosure cases, *see* Govt's Response at 11 & n. 2, but on the "misappropriation" theory established by the Second Circuit. *See United States v. Carpenter,* 791 F.2d 1024, 1027–34 (2d Cir.1986), *aff'd in pertinent part by an equally divided court,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed. 2d 275 (1987); *Securities & Exchange Commission v. Materia,* 745 F.2d 197, 201–03 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *United States v. Newman,* 664 F.2d 12, 15–19 (2d Cir.1981). Under the misappropriation theory, "one who misappropriates

[material][3] nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *Materia,* 745 F.2d at 203. Since neither the Supreme Court nor the Seventh Circuit has passed on the validity of the misappropriation theory,[4] we first must determine whether it states a violation under section 10(b) and Rule 10b–5.

We conclude that the theory should be adopted, at least under the facts alleged in the indictment. While section 10(b) does not explicitly reveal whether misappropriation is a violation, the statute's language broadly prohibits, "in connection with the purchase or sale of *any* security," "any person" from using *"any* manipulative or deceptive device." (Emphasis added.) Likewise, Rule 10b–5 outlaws *"any* device, scheme, or artifice to defraud" and *"any* act, practice, or course of business which operates as a fraud or deceit upon *any* person." (Emphasis added.) "These proscriptions, by statute and rule, are broad and, by repeated use of the word 'any' are obviously meant to be inclusive." *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1982). Moreover, Elliott's alleged use of information entrusted to him, if proven, clearly operated as a fraud or deceit. If the government's allegations are true, Elliott's "theft of information was indeed as fraudulent as if he had converted corporate funds for his personal benefit." *Materia,* 745 F.2d at 201–02; *see also Chiarella,* 445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting) (defendant "misappropriated—stole to put it bluntly— valuable nonpublic information entrusted to him in the utmost confidence"). More-

over, Elliott's alleged fraud was "in connection with" his purchase of stock in target companies.

Elliott argues, however, that the Second Circuit's misappropriation theory runs afoul of the Supreme Court's decision in *Chiarella.* In that case, the defendant, who worked for a financial printer, was able to deduce the identities of corporate takeover targets from draft announcements that his company printed, even though the names of the targets were disguised. Before the takeovers became public, he purchased stock in the targets and sold at a higher price after the takeovers were announced. The Supreme Court held that the defendant's conviction was improper, because he was not a corporate insider and owed no duty to disclose to his sellers. According to the Court, "liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella,* 445 U.S. at 230, 100 S.Ct. at 1115. Elliott argues that the misappropriation theory must be rejected because it does not focus on the "relationship ... between parties to a transaction," but on the duty owed by a defendant to either his employer or the corporation.

As mentioned previously, *see* note 4 *supra,* the United States Supreme Court did not consider the misappropriation theory, but, in our view, the Court's opinion does not preclude the application of the theory. The Court noted that an insider generally has a duty to disclose material nonpublic information or abstain from trading in the corporation's stock. That duty arises from "(i) the existence of a relationship affording access to inside information intended to

---

**3.** We discuss the importance of materiality in Section III.B.

**4.** Litigants have presented the misappropriation theory to the Supreme Court on two occasions, but both times the Court failed to reach the merits of the theory. In *Chiarella,* the Solicitor General suggested misappropriation as an alternative theory to support the defendant's conviction. The Court refused to consider the theory, since it had not been presented to the jury, *Chiarella,* 445 U.S. at 236–37, 100 S.Ct. at 1118–19, but then Chief Justice Burger and Justices

Brennan, Marshall and Blackmun expressed varying degrees of support for it. *See id.* at 238, 100 S.Ct. at 1120 (Brennan J., concurring in judgment); *id.* at 239, 100 S.Ct. at 1121 (Burger, C.J., dissenting); *id.* at 245, 100 S.Ct. at 1123 (Blackmun & Marshall, JJ., dissenting). Similarly, the defendants in *Carpenter* challenged the misappropriation theory as applied to them, but because the Justices split evenly on the securities fraud issue, their views on the misappropriation theory were not disclosed. *See Carpenter,* 108 S.Ct. at 320.

be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Chiarella*, 445 U.S. at 227, 100 S.Ct. at 1114 (citing *In re Cady, Roberts & Co.*, 40 S.E.C. 907 (1961)). The *Chiarella* decision focused on the second of these factors, the unfairness to the other party in the transaction; its decision did not focus as much on the first factor, the access to inside corporate information. But the Court did not completely ignore this factor. In dicta discussing the liability of "tippees," those who receive confidential information from insiders, the Court suggested that the tippee's obligation arises from "his role as a participant after the fact in the insider's breach of a fiduciary duty." *Id.* 445 U.S. at 230 n. 12, 100 S.Ct. at 1116 n. 12. The insider's duty to the corporation was also stressed in *Dirks v. Securities & Exchange Commission*, 463 U.S. 646, 655, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983), where the Court noted that insiders "have independent fiduciary duties to both the corporation and its shareholders." The *Dirks* Court then went on, in dicta, to discuss the duties of so-called "quasi-insiders."

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee. For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

*Id.* at 655 n. 14, 103 S.Ct. at 3262 (citations omitted). We think that this footnote strongly suggests that a quasi-insider attorney like Elliott may not misappropriate information which the corporation client has disclosed "solely for corporate purposes." We recognize that the quoted passage provides less support for imposing misappropriation liability on defendants like the financial printers in *Chiarella* and *Materia*, who may not have had a direct fiduciary duty to the corporation. But we may leave that issue to another day, since Elliott falls within the ambit of the *Dirks* dicta. Accordingly, we adopt the misappropriation theory advanced by the government in this case.

### B. Materiality

■ That does not end our inquiry, however. Even under the misappropriation theory, liability will attach only if the misappropriated information is material. *See Carpenter*, 791 F.2d at 1026, 1029; *Materia*, 745 F.2d at 199. The indictment does not use the word "material," and Elliott argues that the information he is alleged to have misappropriated was not material as a matter of law. According to Elliott, under *James Blackstone Memorial Library Association v. Gulf, Mobile & Ohio Railroad Co.*, 264 F.2d 445 (7th Cir.), *cert. denied*, 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959), the controlling law in the Seventh Circuit at the time of his alleged actions, contemplated purchases of even large blocks of stock were not considered material for Rule 10b–5 purposes.[5] Elliott contends that the information he allegedly misappropriated falls into this category. Although *Blackstone Library* is no longer good law, *see Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), Elliott argues that since the information was legally not material at the time of his actions, he cannot be found to have the requisite intent to violate the securities law.

Elliott's reliance on *Blackstone Library* and similar cases is misplaced. Those

---

**5.** This is Elliott's characterization of the case, not ours; given our resolution of the issue, we need not decide whether Elliott's characterization is correct.

cases represent the typical Rule 10b-5 case, with an emphasis on whether an insider failed to disclose material nonpublic information to a buyer or seller in stock before engaging in the transaction. Quite sensibly, courts evaluate materiality in these cases from the eyes of the non-insider. *See Blackstone Library,* 264 F.2d at 449 ("The real issue ... arises from the alleged failure of [insider buyers] to adequately inform [plaintiff sellers] of material facts which plaintiffs contend, if known by them, would have greatly enhanced the selling price of their shares."); *cf. Basic Inc.,* 108 S.Ct. at 983 (omitted fact is material if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor). In a misappropriation case, however, where the focus is on the insider's duty to the corporation, it would be incongruous to have a materiality standard based on the outsider's point of view.[6] Rather, we believe it is enough if the misappropriated information is "solely for corporate purposes," *Dirks,* 463 U.S. at 655, 103 S.Ct. at 3262, and if a reasonable corporate executive would believe keeping that information confidential was valuable to the corporation. Although not in so many words, the indictment alleges this much, and we deny Elliott's motion to dismiss the securities fraud charges.

### IV. *Forfeiture*

Elliott also has moved to strike certain paragraphs in Count 69 that seek forfeiture of moneys allegedly obtained in violation of RICO. However, we previously granted Elliott's motion to bifurcate the forfeiture proceedings from the ascertainment of guilt, so it is not necessary to decide the issue at this time. Consequently, we will defer consideration of this part of the motion to strike until after the guilt phase of the trial and will consider it only if Elliott is found guilty of violating RICO.

---

**6.** Here we part company with the Second Circuit. That court, along with two of its district courts, has assumed that the materiality standard from typical Rule 10b-5 cases applies in misappropriation cases also. *Carpenter,* 791 F.2d at 1032 n. 9; *SEC v. Grossman,* 87 Civ.

### V. *Conclusion*

For the reasons set forth above, we deny Elliott's motion to the extent it seeks to strike or dismiss the wire fraud, securities fraud and RICO charges (parts 1–3 of motion). We defer consideration of Elliott's motion to strike certain of the forfeiture claims (part 4 of the motion) until after the guilt phase of the trial; we will, of course, consider that issue only if Elliott is found guilty of violating RICO. It is so ordered.

1031, 1987 U.S. Dist. Lexis 1666 at 31–32 (S.D.N. Y.1987); *SEC v. Tome,* 638 F.Supp. 596, 622 (S.D.N.Y.1986). For the reasons set forth in the text, we decline to follow this aspect of the misappropriation theory.