UNITED STATES of America, Appellee,

v.

Israel G. GROSSMAN, Appellant.

No. 777, Docket 87–1419.

United States Court of Appeals,
Second Circuit.

Argued Feb. 19, 1988.

Decided March 25, 1988.

Alan M. Dershowitz, Cambridge, Mass. (Mark D. Cahn, Victoria B. Eiger, Nathan Z. Dershowitz, and Dershowitz & Eiger, New York City, on the brief), for appellant.

Robert Gage, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Celia Goldwag Barenholtz and John F. Savarese, Asst. U.S. Attys., New York City, on the brief), for appellee.

Before TIMBERS, KEARSE and MAHONEY, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Israel G. Grossman appeals from a judgment entered September 15, 1987 in the Southern District of New York, upon a jury verdict, Richard Owen, *District Judge*, convicting appellant on (1) nineteen counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) (1982), 78ff (1982 & Supp. IV 1986) and 17 C.F.R. § 240.10b–5 (1987); and (2) nineteen counts of mail fraud, in violation of 18 U.S.C. §§ 2 and 1341 (1982).

On appeal, Grossman claims principally that he was not given enough time to prepare for trial on a superseding indictment which was returned two business days before trial; and that he should have been given allegedly exculpatory grand jury testimony. Other subordinate claims are raised.

We hold that the district court did not abuse its discretion in denying Grossman's motion to dismiss the superseding indictment or in failing to grant a continuance to prepare for trial on the superseding indictment. We also hold that the government was not obliged to provide Grossman with the grand jury testimony.

We affirm.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

At the time of the events in question, Grossman was an associate in the Manhattan law firm of Kramer, Levin, Nessen, Kamen & Frankel ("Kramer Levin" or "the firm"). He became associated with Kramer Levin in October 1984 and worked in its pension department which consisted of two partners and five associates.

On July 9, 1986, attorneys in the pension department of Kramer Levin were retained by the trustees of a pension plan known as the Retirement Savings Plan for Salaried Employees (the "Plan") of Colt Industries, Inc. ("Colt"). The Plan retained Kramer Levin to represent it in connection with a proposed recapitalization of Colt scheduled for July 20, 1986. Under the recapitaliza-

tion, each Colt shareholder except the Plan would redeem their common stock in exchange for a cash payment of $85 per share and one share in the recapitalized company. A share in the recapitalized company was expected to have a value of $15. The Plan, which held about seven percent of Colt's stock, would receive no cash but instead would receive an equivalent number of shares in the recapitalized company. Public announcement of the proposed recapitalization was expected to cause Colt's stock to rise dramatically.

Starting on July 9, 1986 and continuing until the recapitalization was announced, Kramer Levin attempted to keep information of the recapitalization confidential. On drafts of documents and in correspondence, it used a code name for the matter or omitted the client's name and dollar amounts. It established the policy of not letting others in the firm know of the matter except on a "need-to-know" basis.

Kramer Levin also periodically circulated to its attorneys a general memorandum on its confidentiality policy. This memorandum stated that attorneys receiving information from clients could not use that information for trading and could not give it to anyone else for any purpose. Kramer Levin circulated this confidentiality memorandum several times while Grossman was an associate. The last time the firm circulated the memorandum prior to the Colt transaction was November 1, 1985.

On July 10, 1986 (the day after the Plan retained Kramer Levin), Michael Nassau, the senior partner in the pension department, met with several attorneys in the department (not including Grossman), and briefed them on the Colt recapitalization. Martin Fleischer was one of the associates at the meeting.

That same evening, Grossman went to Fleischer's office and asked him if he was working on the new transaction Grossman had been hearing about. Fleischer said he was. In response to further questions from Grossman, Fleischer told him almost everything about the recapitalization, including the estimated value of the new shares; the amount of cash per share to be

given to the shareholders; and the identity of "the others involved". At trial, Fleischer was unsure whether he divulged to Grossman the name of the client; he testified that he did not recall his response when Grossman asked him the client's name. Fleischer also testified that Grossman had visited him only five other times in the year and a half they had worked together.

The events that occurred subsequent to the meeting between Fleischer and Grossman are in dispute. Substantial circumstantial evidence, however, in particular Kramer Levin's telephone records, indicates that, starting with that same evening of July 10, 1986, Grossman (or someone using his office phone) began placing numerous phone calls to Grossman's friends and relatives (the "relatives", collectively). Fifty calls were made between July 10, and July 16, 1986. Grossman made 20 calls to his uncle, George Hirshberg; 7 calls to his cousin, Walter Herzberg; 5 calls to another cousin's husband, Shimon Lev; 3 calls to Shimon Lev's friend and business partner, Norman Stein; 3 calls to Grossman's brother-in-law, Saul Listokin; and 12 calls to Listokin & Sons ("L & S"), Listokin's company.

Also starting on July 10, someone frequently called from Grossman's office two discount brokerage firms, Whitehall Securities ("Whitehall") and Datek Securities ("Datek"). Grossman had no accounts at these firms, but Listokin and Stein did. These calls, 14 in all, frequently were made before or after calls to L & S or Stein. Moreover, the person in Grossman's office made calls that coincided precisely with the placement of orders to purchase Colt call options. Peter Gamby was the president of Whitehall and the person who received the calls from Grossman's office. He testified that, upon receiving phone orders, it was his practice (1) to put an investor on hold and time-stamp the order; (2) to execute the order and time-stamp it again; and (3) to take the investor off hold to confirm that the order had been placed. Telephone records and Gamby's time-stamps indicated that Whitehall placed the orders during the

exact times when it was receiving calls from Grossman's office.

During the periods immediately preceding and following the July 10–16 period, Grossman placed no phone calls to any of the relatives or brokerage firms, except for 3 calls to Saul Listokin and 16 to L & S.

All of the relatives made massive purchases of Colt "out-of-the-money" call options over the next few days—i.e., between July 11 and July 18, 1986.[1] For example, they purchased over 80% of "August 80" options (options expiring in August and with a strike price of $80)—the most speculative category of option. None of the relatives had purchased Colt securities before, and none sought advice from their brokers regarding their purchases.

The government asserts that Grossman made the purchases for Listokin, both over the phone and once in person at Whitehall. While the evidence is inconclusive, it does show that on July 14, 1986 someone identifying himself as Listokin entered Whitehall and met with Gamby, its president. He purchased options for the benefit of Saul Listokin, and signed the necessary forms. Someone identifying himself as Listokin telephoned Gamby later to change the name of the beneficiary. Gamby sent new forms to Listokin's address, and received them back signed after a few days. Handwriting analysis showed the signature on the second set of forms was Listokin's but the signature on the first set was not. Neither the government nor Grossman used the results of the comparison of Grossman's handwriting with the signature on the first set of forms. Upon reviewing a set of photographs, including Listokin's but not Grossman's, Gamby was certain that his July 14 visitor was not among them. Moreover, upon being shown a second set of photographs, including Grossman's, Gamby said two of them (one of Grossman) resembled his visitor. Neither the government nor Grossman used this evidence at trial.

On July 20, 1986, Colt made its recapitalization public and, as expected, its share price increased dramatically. On July 18, 1986, before the announcement, the price was $66.75 per share; on July 20, 1986, the price reached $93.62 per share. Thus, on a total investment of $33,000, the relatives were able to realize a total profit of $1,470,-000. The Listokin purchases were sold at a loss on July 17 and 18, before the recapitalization was announced. Purchases for Hirschberg, however, more than covered this loss.

The events following the announcement of the recapitalization were proved at trial primarily through the testimony of David Lev, Shimon Lev's brother. David testified about several conversations between Shimon and himself and between Norman Stein and himself. According to David's testimony, Shimon told David that he had "made it big" by purchasing options on a tip from his "cousin Grossman". Shimon told David that he had become concerned about an investigation into his trading in Colt and that he wanted David to become the nominal owner of his call options (which had been purchased through Datek by Stein for Shimon's benefit). David had been in Israel between July 3 and July 23, 1986. Shimon therefore believed that David had an alibi for the time period when he could have received tips or made purchases. David agreed to become the nominal owner of Shimon's call options. Accordingly, in August 1986, Stein transferred cash from his Datek account to David's bank account. Moreover, Stein drew two checks on the proceeds of the Colt options and gave the checks to David who deposited them in his account.

Shimon subsequently told David that he owed Grossman $45,000 or $56,000 as Grossman's share of the Colt transaction. Shimon said that Grossman would accept $25,000 as his share in recognition of the fact that David would have to pay taxes on

---

1. An "out-of-the-money" call option allows a person purchasing the option to buy stock during a limited period in the future at a fixed price (the "strike price"). That price is higher than the current market price. Thus, the option holder essentially is betting that the market price will rise over the strike price within the limited time period. The time limitations make such investments extremely speculative.

the capital gains. David gave Shimon a check for $25,000 with the payee left blank. Shimon, apparently in an attempt to launder the payment, made the check payable to Bnos Rochel, a charity from which, as he told David, he believed he could get cash.

On July 30, 1986, the SEC informed Kramer Levin that it was investigating the Colt transaction and requested the names of all those at the firm who knew of the transaction. Max Schwartz, a Kramer Levin partner, sent a memorandum to the attorneys who had worked on the transaction and asked that they identify anyone else who knew of it. Upon receiving this memorandum, Fleischer told Schwartz that he had told Grossman about the matter. Schwartz included Grossman's name on the list he sent the SEC.

On February 17, 1987, Grossman was arrested. On March 17, 1987, he was indicted (in the "first indictment") which charged him with twelve counts of securities fraud and twelve counts of mail fraud. The securities fraud counts charged Grossman with misappropriating confidential, non-public, information from Kramer Levin. The mail fraud counts charged him with devising a fraudulent scheme to trade in Colt options using confidential information and causing mail to be delivered for the purpose of executing the scheme. The charges were based on events which occurred between July 11 and July 18, 1986.

Grossman moved to dismiss the first indictment, asserting among other things that it failed to state a crime; that it failed to state that he personally benefitted from the fraud; and that the misappropriated information was not "non-public". By an order entered June 26, 1987, Judge Owen denied the motion, although he observed that the charges in the indictment were extremely bare.

On July 23, 1987, the government sent Grossman's counsel a letter notifying them that Shimon Lev might have exculpatory information. Shimon had testified before the grand jury on April 23 and July 14, 1987 under a grant of immunity. The government later refused to turn over Shimon's grand jury testimony to Grossman.

On July 29, 1987, the court held a pre-trial conference. At this conference the government informed the court that during the preceding week it had notified Grossman's counsel that it planned to seek a superseding indictment, and that it had told Grossman's counsel of the contents of the planned superseding indictment. On Thursday, July 30, 1987, two business days before the trial was scheduled to begin, a superseding indictment (the "superseding indictment") was returned. The superseding indictment contained thirty-eight counts, including ten counts involving new transactions. These transactions concerned Listokin, whom the first indictment did not mention. Moreover, the superseding indictment expanded the time frame of the charges; while the first indictment covered only the week of July 11–18, 1987, the superseding indictment covered a period longer than one year, from July 9, 1986 to July 30, 1987. The superseding indictment was filed on July 30, 1987. Grossman's motion to dismiss the superseding indictment was denied.

After a jury trial between August 3 and August 18, 1987, Grossman was convicted on all charges. He was sentenced on September 15, 1987 to concurrent two year prison terms on each of counts one through ten and twenty through thirty. He was fined $25,000. The court suspended Grossman's prison sentences on counts eleven through nineteen and thirty-one through thirty-eight. Grossman was placed on probation for five years upon release from prison. A $50 statutory assessment on each of the counts was imposed. Grossman currently is serving his prison sentence.

From the judgment of conviction, this appeal was taken.

## II.

Grossman claims that the court erred in permitting the superseding indictment to be returned two business days before the trial was scheduled to begin. He cites *United States v. Wilks*, 629 F.2d 669, 672 (10 Cir.1980), for the proposition that a

superseding indictment may be returned any time before trial, absent prejudice to the defendant. He then asserts that he was prejudiced in several ways in this case. Assuming arguendo that Grossman is correct that a court may permit a superseding indictment to be returned only in the absence of prejudice to the defendant, his argument fails because the superseding indictment here did not change substantially the nature of the government's case and caused no such prejudice to Grossman.

Grossman asserts essentially four claims of prejudice. First, he argues chiefly that the superseding indictment expanded the time frame of the charges and thereby allowed the government, through the testimony of David Lev, to introduce the co-conspirator statements of David and Shimon Lev and Norman Stein. He says that these statements were made after the July 11–18 period described in the first indictment and thus would not have been admissible under that indictment. He then asserts that he was prejudiced because these statements, which concerned in part Shimon Lev's plan to pay Grossman $25,000 for Grossman's share in the profits, provided the only evidence that Grossman personally benefitted from the scheme.

■ We find this argument to be frivolous. As the government succinctly points out, this evidence would have been relevant under the first indictment. Specifically, it would have been relevant under Fed.R.Evid. 401 because such evidence—including the evidence of Shimon Lev's intention to pay Grossman $25,000—tended to prove Grossman's motive and fraudulent intent which were disputed issues at trial. In the language of Rule 401, such evidence concerned facts that were "of consequence to the determination of the action." *See, e.g., United States v. Tager,* 788 F.2d 349, 352–53 (6 Cir.1986) (evidence of previous unpaid tax judgment relevant to show intent and motive for securities fraud).

Grossman attempts to respond to this claim of the government by arguing that the superseding indictment at least "eased" the way for the introduction of the co-conspirator statements under Fed.R.Evid. 801(d)(2)(E). He asserts that Rule 801(d)(2)(E) requires that co-conspirator statements be made in furtherance of and during the course of a conspiracy in which the defendant was involved; that the statements in question here were made after the time frame of the first indictment had ended; that it was "hardly a forgone conclusion" that the district court would have admitted the statements under the first indictment; and that any presumption drawn in such a case should operate in the defendant's favor.

■ This reasoning strikes us as a smoke screen. It simply does not address the original flaw in Grossman's argument, namely, that the co-conspirator statements would have been *equally* admissible (or inadmissible) under either indictment because they were *relevant* under each. Whether they were admissible under Rule 801(d)(2)(E) is a concern entirely separate from the issue in the instant case. The sole issue here is whether the superseding indictment unfairly put Grossman in a worse position than had the first indictment. We conclude that it did not put him in a worse position. The expanded time frame of the superseding indictment did not in any way "ease" admission under Rule 801, because the government was not required to "charge a conspiracy to take advantage of Fed.R.Evid. 801(d)(2)(E)." *United States v. Stratton,* 779 F.2d 820, 829 (2 Cir.1985), *cert. denied,* 476 U.S. 1162 (1986). "The Government merely needs to demonstrate that the declarant and the defendants against whom the statements are offered are members of a conspiracy in furtherance of which the statements are made, and that this conspiracy is 'factually intertwined' with the *offenses* being tried." *Id.* (citations omitted) (emphasis added) (quoting *United States v. Lyles,* 593 F.2d 182, 194 (2 Cir.), *cert. denied,* 440 U.S. 972 (1979). Thus, the indictment did not have to state explicitly the exact time frame that would become relevant at trial, as long as any co-conspirator statements the government used were derived from a conspiracy that was "factually intertwined" with the offenses stated in the indictment.

In the instant case, Shimon Lev's statements about paying Grossman his share of the Colt profits undoubtedly were "factually intertwined" with "the offenses being tried", i.e., Grossman's misappropriation and dissemination of confidential information to generate those same Colt profits. More important, however, is the fact that the statements were *equally* "intertwined" with the offenses charged under either the first indictment or the superseding indictment. The government did not charge conspiracy under either indictment; the statement would have been equally admissible (or inadmissible) under either indictment; and thus the superseding indictment could not have prejudiced Grossman in the way claimed.

Second, Grossman argues that the superseding indictment prejudiced him because it failed to give him timely notice that he would have to explain Shimon Lev's statements about his plan to pay Grossman $25,000 or defend himself on the trades of his brother-in-law, Saul Listokin, which had not been included in the first indictment. He asserts that, had he been given earlier notice, he would have (1) attempted to identify the person who met with Gamby at Whitehall; (2) attacked the accuracy of the Kramer Levin telephone records; and (3) attempted to contact Bnos Rochel, the charity which Shimon Lev said he could use to launder the $25,000 payment to Grossman. Each of these assertions is without merit since Grossman in fact did have notice that these matters would be raised at trial. In April 1986, three months before the superseding indictment was returned, the government provided Grossman with full discovery regarding the Listokin trades, including the telephone records. Grossman therefore both knew that the government would be using the Listokin trades at trial and had the opportunity to attack the telephone records for accuracy. Grossman also knew that the SEC had included the Listokin trades in its civil proceeding against Grossman. While Grossman claims that this fact should be discounted because the government has no case authority for the proposition that notice of the SEC's allegations "was the equivalent

of notice that [he] would have to defend against those allegations in a criminal proceeding", Grossman simply ignores the fact that the issue, even as he frames it, is whether he was prejudiced by the new indictment. Since he in fact had notice of the Listokin trades and the government's interest in them, we are satisfied that in this particular case the defendant was protected from prejudice.

Third, Grossman argues that he was prejudiced because it was not until the superseding indictment was returned that the government charged that he personally benefitted from the scheme. This argument fails to recognize that no indictment is required to charge that a defendant personally benefitted from a crime—an indictment "need do little more than to track the language of the statute charged and state the time and place ... of the alleged crime". *United States v. Tramunti*, 513 F.2d 1087, 1113 (2 Cir.), *cert. denied*, 423 U.S. 832 (1975). Accordingly, Grossman can hardly have been prejudiced by the absence of this optional information in the first indictment.

Fourth, Grossman argues conclusorily that the superseding indictment was returned for vindictive reasons, referring apparently to Grossman's refusal to plead guilty. Grossman has produced no evidence whatsoever of vindictiveness and, although we strongly disapprove of the prosecutor's tardiness in preparing the superseding indictment, we find no evidence suggesting a vindictive motivation.

In short, the superseding indictment did not alter substantially the government's case against Grossman. Its return, even two days before trial, caused him no prejudice. We hold that the court did not abuse its discretion in refusing to dismiss the superseding indictment or in failing to grant Grossman a continuance.

### III.

█ We turn next to Grossman's claim that he was entitled to the grand jury testimony of Shimon Lev which he says was exculpatory. He asserts that the

government violated *Brady v. Maryland,* 373 U.S. 83 (1963), when it refused to turn over Shimon's allegedly exculpatory grand jury testimony. Grossman claims that Shimon's testimony would have been admissible under Fed.R.Evid. 804(b)(1) (former testimony) and Fed.R.Evid. 806 (impeachment of hearsay declarant). We find this claim to be without merit.

██ No *Brady* violation occurred here because *Brady* does not require the government to turn over exculpatory evidence "if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Gaggi,* 811 F.2d 47, 59 (2 Cir.), *cert. denied,* 107 S.Ct. 3214 (1987). The rationale for our rule is that *Brady* is designed to "assure that the defendant will not be denied access to exculpatory evidence *only known to the Government.*" *United States v. LeRoy,* 687 F.2d 610, 619 (2 Cir.1982) (emphasis added), *cert. denied,* 459 U.S. 1174 (1983). Accordingly, the government had a duty to disclose only "information which had been known to the prosecution but unknown to the defense." *United States v. Agurs,* 427 U.S. 97, 103 (1976). The government has no duty actually to turn over grand jury testimony where the defendant knows of the witness' identity; that the witness "might have testified before the grand jury"; and that "[the witness'] statements might have supported [the defendant's] defense." *LeRoy, supra,* 687 F.2d at 619.

*LeRoy* controls this case. Grossman knew of Shimon's identity. He had been informed specifically in the government's letter of July 23, 1987 that Shimon might have given the grand jury exculpatory evi-

dence. While Grossman attempts to distinguish *LeRoy* on several grounds, none of the differences he asserts is significant— for example, the fact that LeRoy never explicitly asked the prosecution for the grand jury testimony does not change the analysis. While Grossman claims that he needed the actual transcripts of the grand jury testimony to impeach Shimon, his claim fails because, as stated above, he never raised his impeachment argument in the district court and therefore waived it.

We hold that the government was not obliged to provide Grossman with the grand jury testimony of Shimon Lev.

## IV.

Grossman raises three other subordinate claims that warrant only brief mention: (1) that his mail fraud convictions should be reversed because Kramer Levin did not have a "property interest" in the misappropriated confidential information; (2) that his mail fraud convictions should be reversed because the mailings were merely "incidental" to his scheme to defraud; and (3) that the district court should have instructed the jury to find whether Grossman knew of Kramer Levin's confidentiality policy and whether his disclosure would violate that policy. We find each of these claims to be frivolous.

First, Grossman says that the mail fraud statute, 18 U.S.C. § 1341 (1982),[2] protects only "property rights", *McNally v. United States,* 107 S.Ct. 2875, 2879 (1987), and does not protect intangible interests, such as the reputation of a business. He cites *Carpenter v. United States,* 108 S.Ct. 316 (1987), for the proposition that confidential business information will be "property"

---

**2.** Section 1341 provides:

"Whoever, having devised or intending to devise any *scheme or artifice to defraud,* or for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented *to be* or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempt-

ing so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years or both."

18 U.S.C. § 1341 (1982) (emphasis added).

only when (1) the information is of commercial value to the holder of the information and that holder has exclusive right to exploit it; or (2) the holder of the information gathered it at the cost of its own "enterprise, organization, skill, labor and money." *Id.* at 321. Grossman then asserts that Kramer Levin had no "property interest" in the Colt confidential information because Kramer Levin (1) could not use the information for its commercial value or have the exclusive right to exploit it; and (2) did not gather the information through its own enterprise, organization, skill, labor and money. Grossman concludes that his mail fraud convictions should be reversed. We disagree.

■ His claim is specious and fails for several reasons. First, Grossman distorts *Carpenter*. In context, the language which he cites merely *describes* the confidential information in that case; it does not require that *all* confidential information must be of the same nature to be considered "property". *Id.* at 321. *Carpenter* actually holds generally that, even though "confidential business information" is intangible, it "has long been recognized as property." *Id.* at 320. Thus, the information in this case regarding the Colt recapitalization clearly falls within the definition of property under *Carpenter*. Second, the fact that Kramer Levin could not commercially exploit the information by trading on it does not mean the confidentiality of the information had no commercial value to the firm. As several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients.

■ Second, Grossman claims that the mail fraud convictions should be reversed because the mailings on which they were based were the mailings of confirmation slips from brokerage houses. He asserts that these mailings were only "incidental" to the fraud scheme and that the law requires that the mailings be "for the purpose of executing the scheme". *United States v. Lane,* 474 U.S. 438, 451 (1986); *see also United States v. Maze,* 414 U.S. 395, 400 (1974). Here, however, the mailings of the confirmation slips *did* further the purpose of executing the scheme. The confirmation slips (1) notified the relatives that the purchase or sale actually had been completed; (2) provided an on-going tally of purchases, allowing the relatives to cover each other's positions; (3) concealed the fraud by maintaining an appearance of normality, *see United States v. Cohen,* 518 F.2d 727, 737 (2 Cir.), *cert. denied,* 423 U.S. 926 (1975); and (4) allowed the relatives to demonstrate ownership after the recapitalization announcement. *Pereira v. United States,* 347 U.S. 1 (1954).

■ Third, Grossman claims that the court should have charged the jury specifically to find whether he knew about Kramer Levin's confidentiality policy and whether his use of the confidential information would violate that policy. He theorizes that, since he was not on the team of attorneys who worked on the transaction, he might never have been told that information on the transaction was confidential and he might have thought that it was either public or not material. Grossman, however, did not object to the jury charge. Absent "plain error", therefore, he has waived this claim. *United States v. Arocena,* 778 F.2d 943, 948 (2 Cir.1985), *cert. denied,* 475 U.S. 1053 (1986); Fed.R.Crim. P. 30, 52(b).

■ We hold that the district court was not required to charge the jury on Grossman's specific knowledge of the confidentiality policy; and that, even if the court had so charged, the jury was unlikely to have accepted the theory that Grossman did not realize he was doing anything improper. We therefore hold that the trial judge did not commit plain error.

In short, having carefully considered all of Grossman's claims of error, including his subordinate ones, we hold that none has merit.

## V.

To summarize:

We hold that the district court did not abuse its discretion in denying Grossman's motion to dismiss the superseding indictment and in failing to grant a continuance to prepare for trial under the superseding indictment. We also hold that the government was not obliged to provide Grossman with the grand jury testimony. We further hold that Grossman's subordinate claims of error are frivolous.

Affirmed.