**UNITED STATES of America, Plaintiff,**

v.

**Robert Howard WILLIS, Defendant.**

**No. S 89 Cr. 561 (MGC).**

United States District Court,
S.D. New York.

May 15, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Henry Pittman, Kevin Czinger, Asst. U.S. Attys., New York City, for U.S.

Spengler Carlson Gubar Brodsky & Frischling by Edward Brodsky, Lawrence S. Hirsh, Jackie L. Gross, New York City, for defendant.

## OPINION

CEDARBAUM, District Judge.

In a forty-six count indictment (the "Indictment"), defendant Robert Howard Willis is charged with securities fraud and mail fraud in connection with his purchases of common stock of the BankAmerica Corporation ("BankAmerica") in January and February of 1986. The defendant, a psychiatrist, is charged with having used material, non-public information acquired from a patient for profitable trading in the stock of BankAmerica. Dr. Willis is charged in Counts One through Twenty–Three with securities fraud in violation of Sections 10(b) and 32 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j, 78ff, and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. Counts Twenty–Four through Forty–Six charge that Willis' conduct constituted mail fraud in violation of 18 U.S.C. §§ 1341 and 1342.

Dr. Willis has moved pursuant to Fed.R. Crim.P. 12(b) to dismiss all counts of the Indictment on the ground that the Indictment fails to allege any criminal offense. For the reasons discussed below, defendant's motion is denied.

### THE INDICTMENT

In considering a motion to dismiss an indictment, I must assume the truth of the facts as alleged in the indictment. *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952); *United States v. Pacione,* 738 F.2d 567, 568 (2d Cir.1984); *United States v. Von Barta,* 635 F.2d 999, 1002 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). The facts as alleged in the Indictment may be summarized as follows.

Beginning in late October or early November 1985, Sanford I. Weill developed an interest in becoming Chief Executive Officer ("CEO") of BankAmerica. Between 1970 and 1981, Weill served as the CEO of Shearson Loeb Rhodes and several of its predecessor entities (collectively "Shearson"). In 1981, Weill sold his controlling interest in Shearson to the American Express Company, and between 1981 and 1985, he served as President of American Express. As part of his effort to become CEO of BankAmerica, Weill secured a commitment from Shearson to invest $1 billion in BankAmerica if he was successful in his negotiations with BankAmerica.

Throughout late January and February 1986, Weill attempted to meet with several of the directors of BankAmerica in order to discuss his proposals for BankAmerica. Until at least February 20, 1986, these contacts were not disclosed publicly. During the period in which Weill was attempting to negotiate with BankAmerica, the public information regarding BankAmerica was generally unfavorable. There were news reports that Moody's Investors' Service had downgraded $5.7 billion of debt owed by BankAmerica, that BankAmerica had incurred a loss of $178 million in the fourth quarter of 1985, and that BankAmerica had

posted a net loss of $337 million for calendar year 1985.

On February 20, 1986, BankAmerica announced that Weill had sought to become its CEO but that BankAmerica was not interested in his offer. On February 20, 1986, BankAmerica stock traded on the New York Stock Exchange at prices ranging from $13\frac{7}{8}$ to $15\frac{5}{8}$ per share. The day after the announcement, BankAmerica stock traded on the New York Stock Exchange at prices ranging from 14 to $15\frac{1}{2}$. During the five weeks preceding the announcement, BankAmerica stock had traded on the New York Stock Exchange at prices ranging between 12 and $14\frac{7}{8}$.

Weill discussed his effort to become CEO of BankAmerica with his wife. Weill's wife was a patient of Dr. Willis.[1] Mrs. Weill discussed her husband's efforts to become CEO of BankAmerica with Dr. Willis prior to the public announcement of Weill's interest in Bankamerica. She also disclosed to Dr. Willis that Shearson had agreed to invest in BankAmerica if Weill succeeded in becoming its CEO.

From approximately January 14, 1986 until February 6, 1986, Dr. Willis disclosed to his broker this material, confidential information, and purchased BankAmerica common stock. Between those dates, Dr. Willis purchased a total of 13,000 shares of BankAmerica common stock for himself and his children at prices ranging from $12\frac{1}{8}$ to $14\frac{3}{4}$ per share. On February 21, 1986, after the public announcement of Weill's effort to become CEO of BankAmerica, Dr. Willis sold at a price of $15\frac{3}{8}$ per share all the BankAmerica common shares that he had purchased between January 14 and February 6, 1986. The total profit was approximately $27,475.79.

Dr. Willis purchased his position in BankAmerica common stock in twenty-three different transactions. Accordingly, the Indictment charges him with twenty-three counts of securities fraud (collectively "the 10b–5 Counts"). Since confirmations of the purchases were sent to Dr. Willis through the mails, he is also charged with twenty-three counts of mail fraud (collectively "the Mail Fraud Counts").

## I. Misappropriation of Confidential Information as Securities Fraud: The 10b–5 Counts [2]

■ The novel facts of this Indictment make the securities fraud issue one of first impression, but the theory of the Indictment is not new. The Government is proceeding solely on a "misappropriation" theory of liability for securities fraud which is entirely different from the theory that was rejected by the Supreme Court in *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The "misappropriation" theory, which has been developed by the Second Circuit, has been recognized by the Supreme Court, but not yet approved by a majority of that Court. *See Chiarella v. United States*, 445 U.S. 222, 235–37, 100 S.Ct. 1108, 1118–19, 63 L.Ed.2d 348 (1980); *see also Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (convictions under the securities laws affirmed without discussion by an evenly divided Court).

**1.** The Indictment refers to the patient as "Jane Doe." Both the defendant and the Government agree that Jane Doe is really Joan Weill, the wife of Sanford I. Weill.

**2.** Section 10(b), 15 U.S.C. § 78j(b), prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

    Rule 10b–5, 17 C.F.R. § 240.10b–5 states:

    It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice or course of business which operates or would operate as fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Indictment charges that Dr. Willis breached the physician's traditional duty of confidentiality on which his patient was entitled to rely when he misappropriated for his personal profit material, non-public, business information confided to him by his patient for her psychiatric diagnosis and treatment, and that when Dr. Willis purchased BankAmerica securities on the basis of his patient's confidential information, he defrauded his patient in connection with the purchase of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5.

Central to the sufficiency of the Indictment, and central to the misappropriation theory of securities fraud, is a breach of fiduciary or similar duty of trust and confidence. It is difficult to imagine a relationship that requires a higher degree of trust and confidence than the traditional relationship of physician and patient. The "oath" of Hippocrates, which has guided the practice of medicine for more than 2,000 years, concludes with the following words:

> Whatsoever things I see or hear concerning the life of men, in my attendance on the sick or even apart therefrom, which ought not be noised abroad, I will keep silence thereon, counting such things to be as sacred secrets.

15 *The Encyclopedia Britannica* 95a (1971). *See also Hammonds v. Aetna Casualty & Surety Co.*, 243 F.Supp. 793, 801 (N.D.Ohio 1965) ("Almost every member of the public is aware of the promise of discretion contained in the Hippocratic oath, and every patient has a right to rely upon this warranty of silence."); *MacDonald v. Clinger*, 84 A.D.2d 482, 485, 446 N.Y.S.2d 801, 803 (4th Dep't 1982).

### A. The Cases

The misappropriation theory was articulated by the Second Circuit in *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981), *aff'd after remand*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). In that case, the defendant, a securities trader, had received from employees of two investment banking firms confidential information concerning proposed mergers and acquisitions by the firms' clients. The defendant passed this information to two other individuals who purchased stock in companies that were merger and takeover targets. When the mergers and takeovers were publicly announced, the stock was sold for a substantial profit, and the profit was shared among the participants.

The district court dismissed the indictment, and the Second Circuit reversed. After noting that Rule 10b–5 does not require the defrauding of a buyer or seller of securities, *Id.* at 17, the court held that the misappropriation of the information from the investment banking firms constituted fraud within the meaning of Section 10(b) and Rule 10b–5.

> In determining whether the indictment in the instant case charges a violation of Rule 10b–5, we need spend little time on the issue of fraud and deceit.
>
> \*    \*    \*    \*    \*    \*
>
> In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. Appellee would have had to be most ingenuous to believe that Congress intended to establish a less rigorous code of conduct under the Securities Acts.

*Id.* at 17–18 (citations omitted).

Similarly, in *SEC v. Materia*, 745 F.2d 197 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985), the Second Circuit affirmed the decision of the district court that ordered the defendant to disgorge profits from securities transactions that were based on confidential information misappropriated from his employer. In that case, as in *Chiarella*, the defendant was an employee of a financial printer who learned the identity of tender offer targets in the course of his employment. He purchased the securities of those targets prior to the public announcement of the tender offer and then sold them at a substantial gain after the offers had been made public. In *Materia*, unlike *Chiarella*, the trial court applied the misappropriation theory of securities fraud.

*Chiarella,* 445 U.S. at 235–37, 100 S.Ct. at 1118–19.

In affirming Materia's conviction, the Second Circuit held that "one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." 745 F.2d at 203 (footnote omitted). The court treated Materia's breach of duty to his employer as fraudulent within the meaning of Section 10(b) and Rule 10b–5 and emphasized the broad scope of these provisions. *Id.* at 201–02.

The Second Circuit again applied the misappropriation theory in *United States v. Carpenter,* 791 F.2d 1024 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). In that case, the Second Circuit affirmed the conviction of a *Wall Street Journal* columnist and others for trading in securities on the basis of advance knowledge of the timing and content of the *Journal*'s "Heard on the Street" column. Appellants in *Carpenter* attempted to distinguish *Newman* and *Materia* on the ground that the defendants in those cases breached a duty not only to their employers, but also to their employer's clients, and that those defendants were, therefore, "corporate insiders or so-called quasi-insiders who owe to the corporation and its shareholders a fiduciary duty of abstention or disclosure." 791 F.2d at 1028–29 (citations omitted). The court rejected that argument, describing the extent of the misappropriation theory as follows:

> Appellants read *Newman* and *Materia* and interpret the misappropriation theory too narrowly. Notwithstanding the existence of corporate clients of the employers in *Newman* and *Materia,* the misappropriation theory more broadly proscribes the conversion by "insiders" *or others* of material non-public information in connection with the purchase or sale of securities.

*Id.* at 1029 (emphasis in original) (citations omitted).

This case is closer to *Newman* and *Materia* than to *Carpenter.* The *Wall Street Journal,* the employer in *Carpenter,* was free to trade on its own information, unlike the employers in *Newman* and *Materia,* who owed a duty of confidence to their customers. The employer in this case, the psychiatric patient, had a duty not to trade because she acquired the information as a marital confidence from an "insider." Weill was an "insider" because he was engaged in negotiations with BankAmerica.

In *SEC v. Musella,* 578 F.Supp. 425 (S.D. N.Y.1984), the SEC sought an injunction and other relief against several individuals. The SEC alleged that Ihne, the former manager of office services at a large New York City law firm, had misappropriated information regarding at least four imminent corporate takeovers or reorganizations and had passed it on to other individuals who purchased stock on the basis of information. Judge Haight granted the SEC's request for a preliminary injunction based on the misappropriation theory. *Id.* at 434–43.

In *United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985), the son of a director of Amax Petroleum Corporation traded in Amax options on the basis of information confided to him by his father regarding a merger of Amax into Standard Oil Company of California. The indictment alleged that the defendant's father had communicated this information to the defendant in confidence and with the expectation that the defendant would respect this confidence. Judge Ward denied a motion to dismiss the indictment on the ground that the misappropriation of secret information for personal aggrandizement in breach of an established relationship of trust and confidence constitutes fraud.

Other decisions in this circuit have also applied the misappropriation theory. *See, e.g., United States v. Grossman,* 843 F.2d 78 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989) (applying misappropriation theory to attorney who traded on information misappropriated from law firm).

#### B. Willis' Original Arguments

Dr. Willis argues that this case is different from all prior misappropriation cases,

including *Reed*, because the Indictment contains no allegation that he breached a duty to a "market participant or to any participant in the corporate world." Willis Mem. at 7. In effect, Dr. Willis argues that his patients should be divided into two categories—those in the "market or corporate world" and others. The psychiatrist-patient duty of confidentiality is the same for both groups, but a psychiatrist's breach of that duty would result in 10b–5 liability only if the confiding patient happened to fall into the first category. This accidental division does not provide a reasoned basis for limiting the misappropriation theory to breaches of duty to participants in the market or corporate world.

The underlying rationale of the misappropriation theory is that a person who receives secret business information from another because of an established relationship of trust and confidence between them has a duty to keep that information confidential. By breaching that duty and appropriating the confidential information for his own advantage, the fiduciary is defrauding the confider who was entitled to rely on the fiduciary's tacit representation of confidentiality.

Applying that theory to this case, by practicing psychiatry, Dr. Willis held himself out as a physician with recognized obligations of confidentiality for his patient's secrets. *See, e.g., MacDonald v. Clinger*, 84 A.D.2d 482, 446 N.Y.S.2d 801 (4th Dep't 1982); *Doe v. Roe*, 93 Misc.2d 201, 400 N.Y.S.2d 668 (Sup.Ct.N.Y.Co. 1977); *Hammonds v. Aetna Casualty & Surety*, 243 F.Supp. 793 (N.D.Ohio 1965). *See also* N.Y.Civ.Prac.L. & R. § 4504 (McKinney 1990). By not advising his patient of his intention to disclose her confidential information and to profit personally from it, Dr. Willis fraudulently induced his patient to confide in him in connection with his purchase and sale of securities.

Willis also contends that the 10b–5 Counts of the Indictment are defective because they do not allege a legally cognizable injury or potential injury to his patient, the victim of the fraud. This argument is unpersuasive. Courts recognize that a patient has a cause of action against a psychiatrist who discloses confidential information learned in the course of treatment. *See, e.g., MacDonald v. Clinger*, 84 A.D.2d 482, 446 N.Y.S.2d 801 (4th Dep't 1982); *Doe v. Roe*, 93 Misc.2d 201, 400 N.Y.S.2d 668 (Sup.Ct.N.Y.Co.1977). *Cf. Hammonds v. Aetna Casualty & Surety*, 243 F.Supp. 793 (N.D. Ohio 1965). Furthermore, Mrs. Weill had an economic interest in preserving the confidentiality of the information disclosed because Willis' release of the information might have jeopardized her husband's advancement to CEO of BankAmerica in which she had a financial interest.

The patient also had a property interest in a continuing course of psychiatric treatment. The success of a psychiatrist-patient relationship often depends on the maintenance of the duty of confidentiality. As the court stated in *Doe v. Roe:*

> This [need to keep in confidence all disclosures made by the patient] is particularly and necessarily true of the psychiatric relationship, for in the dynamics of psychotherapy "[t]he patient is called upon to discuss in a candid and frank manner personal material of the most intimate and disturbing nature ... * * * To speak of such things to another human requires an atmosphere of unusual trust, confidence and tolerance. * * * Patients will be helped only if they can form a trusting relationship with the psychiatrist."

93 Misc.2d 201, 210, 400 N.Y.S.2d 668, 674–75 (Sup.Ct.N.Y.Co.1977), *quoting* Heller, *Some Comments to Lawyers on the Practice of Psychiatry*, 30 Temple L.Rev. 401, 405–406 (1957). Dr. Willis' disclosures jeopardized the psychiatrist-patient relationship and put at risk the patient's financial investment in psychiatric treatment, either by provoking the termination of the relationship and increasing the cost of treatment by requiring that she find a new psychiatrist, or by requiring additional treatment time to discuss the impact of his disclosures on their relationship.

In any event, the Second Circuit has clearly and concisely stated "that one who misappropriates nonpublic information in

breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *Materia*, 745 F.2d at 203. *See also Carpenter*, 791 F.2d at 1029. The 10b–5 Counts charge that this is precisely what Willis did, and the controlling precedents bring these charges within the scope of the securities laws.

### C. Post–Chestman Argument

Since the recent decision of the Second Circuit in *United States v. Chestman*, 903 F.2d 75 (2d Cir.1990), Willis has renewed his motion to dismiss the Indictment. In *Chestman*, the Second Circuit reversed the defendant's convictions for securities fraud and mail fraud on the ground that there was no proof that he knew that the information on which he traded was confidential. "It is impossible to attribute knowledge of confidentiality to Chestman in view of the attenuated passage of the information and in the absence of any showing that the information retained any kind of confidentiality in the hands of Keith Loeb." *Id.*, 903 F.2d at 79. Willis argues that the Indictment in this case is defective because it does not allege that Mrs. Weill told him "(i) that the information was confidential, or (ii) that Willis should not disclose or otherwise use the information." Letter from defendant's counsel to the court (May 7, 1990).

*Chestman* does not require a holding in this case that it is necessary for a patient to tell her treating psychiatrist that he should not disclose information confided to him by her in the course of her treatment. In *Chestman*, the Court of Appeals held that "[e]vidence that Keith Loeb revealed the critical information in breach of a duty of trust and confidence known to Chestman is essential to the imposition of liability upon Chestman as aider/abettor ... or as tippee...." *Id.* at 79 (citations omitted). Mrs. Weill is not in the position of Keith Loeb and Dr. Willis is not in the position of Chestman. This is not a case of aider/abettor or of tipper/tippee. The information imparted to Mrs. Weill by her husband was, by reason of the nature of that information, the nature of their relation-ship, and the significance of that information to their personal lives, obviously confidential. By revealing the information to her psychiatrist in the course of treatment, Mrs. Weill did not breach the duty of trust and confidence which she owed to her husband. According to the allegations of the Indictment, it was only the defendant Willis who breached a duty of trust and confidence by misappropriating valuable non-public confidential information acquired by him in the psychiatrist-patient relationship. Dr. Willis' knowledge or lack of knowledge about whether his patient's husband characterized the information as "confidential" when Mr. Weill discussed it with her is irrelevant. Similarly irrelevant is whether Mrs. Weill labelled the information "confidential" when she revealed it to Dr. Willis. What is relevant is that Dr. Willis knew that he was receiving the information in confidence, that it was valuable non-public information, and that by disclosing and using the information for his personal benefit, he was breaching the duty of trust and confidence that he owed to his patient. That Dr. Willis is alleged to have sold the BankAmerica shares on the very day following the public announcement of Mr. Weill's effort to become CEO of BankAmerica further supports this conclusion as to what can be drawn from the Indictment.

Furthermore, in this case, there is none of the attenuation about which the Second Circuit was concerned in *Chestman*. Willis is not in Chestman's position at the end of a chain of recipients of confidential information. This information which affected the marital home was confided directly by the insider-husband to his wife and by the insider's wife to her treating psychiatrist. It did not lose its confidential character by "passing through several family channels" or become nothing more than "family gossip." *Id.* at 80.

Thus, the Indictment is sufficient. What the evidence will show at trial awaits the event.

### II. *The Mail Fraud Counts*

██ Willis' attack on the Mail Fraud Counts of the Indictment also fails. As the

Second Circuit stated in *Carpenter:* "It is clear that 'confidential and nonpublic commercial information' may constitute fraudulently misappropriated 'property' under the mail fraud statute." 791 F.2d at 1034. This principle was not altered by the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*, the Supreme Court held that the mail fraud statute is "limited in scope to the protection of property rights," *Id.* at 360, 107 S.Ct. at 2881, and "does not refer to the intangible right of the citizenry to good government."[3] *Id.* at 356, 107 S.Ct. at 2879.

Confidential business information is property within the meaning of the mail fraud statute. In *United States v. Grossman*, 843 F.2d 78 (1988), *cert. denied,* — U.S. ——, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989), the Second Circuit reviewed the law after *McNally* and *Carpenter* and explained the definition of property in *Carpenter* as follows: "*Carpenter* actually holds generally that, even though 'confidential business information' is intangible, it 'has long been recognized as property.'" *Id.* at 86 (citation omitted). *See also Chestman*, 903 F.2d 75, 80. The confidential information in this case regarding Sanford Weill's interest in BankAmerica and the commitment by Shearson to invest $1 billion in BankAmerica falls within the definition of property adopted by this circuit. As discussed above, Mrs. Weill had a pecuniary interest in the non-disclosure of this information.

■ Willis' argument that the Mail Fraud Counts are deficient because the mails were not used in furtherance of the scheme is also unpersuasive. The mail fraud statute requires that "the charged 'mailings' must be 'for the purpose of executing the scheme.'" *United States v. Lane*, 474 U.S. 438, 451, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986), *citing Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 150, 89 L.Ed. 88 (1944). Willis argues that the confirmations, the mailings charged, played no role in the scheme alleged in the indict-

ment. However, the scheme alleged in the indictment is not only a scheme to misappropriate confidential business information. It is also a scheme to exploit that information by trading in securities on the basis of the improperly acquired information. Trading in securities was an integral part of the scheme, and the mailing of confirmations to verify Willis' purchases did further and was in execution of this aspect of the scheme.

In *United States v. Grossman*, 843 F.2d 78, 86 (1988), *cert. denied,* — U.S. ——, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989), the Second Circuit found mailings of broker's confirmation slips a sufficient predicate for mail fraud because they did further the purpose of executing the scheme. The reasoning in *Grossman* controls the result here. In this case, as in *Grossman*, the confirmations: (1) notified Willis of the completion of the purchases; (2) provided an ongoing tally of purchases so he could track them for his profit sharing plan, his pension plan, and his gifts to his children; (3) concealed the fraud by maintaining an appearance or normality; and (4) provided the different recipients with evidence of ownership. *Id.*

Finally, for the reasons discussed under the 10b–5 Counts above, *Chestman* does not require dismissal of the Mail Fraud Counts.

■ In sum, Willis is charged with misappropriating from his patient valuable, albeit intangible, property in the form of commercial information, exploiting it for his own profit, and using the mails to bring his scheme to fruition. This charged conduct falls within the proscription of the mail fraud statute.

### III. *Willis's Due Process Argument*

■ Finally, Willis argues that prosecuting him for securities fraud deprives him of due process of law in violation of the Fifth Amendment of the Constitution because the law of insider trading was too unclear in 1986 to provide him with fair notice that

---

**3.** The statute subsequently adopted by Congress on November 18, 1988, to amend the criminal code in light of *McNally*, 18 U.S.C. § 1346 (1988), is irrelevant to this case.

his conduct was illegal. The same argument has been raised and rejected in similar contexts, and is rejected here.

The Second Circuit has repeatedly rebuffed attempts to invalidate criminal prosecutions brought under Section 10(b) and Rule 10b–5 on the ground that those antifraud provisions give inadequate notice of the conduct that they proscribe. *See United States v. Persky*, 520 F.2d 283, 287–88 (2d Cir.1975); *Carpenter*, 791 F.2d at 1034; *Newman*, 664 F.2d at 19. Although Willis argues that the misappropriation theory is "largely undefined," Willis Mem. at 28, it has been the law of this circuit for many years. Dr. Willis had fair notice from *Newman* and *Materia* that the conduct charged might violate Section 10(b). The fact that there is no reported precedent with precisely the same facts is immaterial. As the Second Circuit stated in *United States v. Brown*, 555 F.2d 336, 339–40 (2d Cir.1977) (rejecting "fair notice" argument):

> The fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sanctions of the securities fraud provisions here involved.

Moreover, every physician is aware of the confidential nature of communications by his patients. Accordingly, Dr. Willis had adequate notice that it would be unlawful for him to disclose his patient's information and use it to trade in securities for his personal benefit.

## CONCLUSION

For all of the foregoing reasons, defendant's motion to dismiss the Indictment is denied.

SO ORDERED.