**UNITED STATES of America, Plaintiff,**

v.

**Robert Howard WILLIS, Defendant.**

**No. S 89 Cr. 561 (MGC).**

United States District Court,
S.D. New York.

Dec. 2, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City by Denis J. McInerney, Asst. U.S. Atty., for U.S.

Spengler Carlson Gubar Brodsky & Frischling, New York City by Edward Brodsky, Lawrence S. Hirsh, for defendant.

## OPINION

CEDARBAUM, District Judge.

For the third time, defendant has moved to dismiss the indictment in this case.[1] Familiarity is assumed with my previous opinion denying defendant's earlier motions. That opinion is reported at 737 F.Supp. 269 (1990). I shall not repeat my extensive discussion of the charges set out in the indictment or of the misappropriation theory of liability under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder on which the government relies in this prosecution. I shall only note that the gravamen of the charges is that the defendant, who is a practicing psychiatrist, traded on material, nonpublic information confided to him by his patient as part of a course of treatment, and that the indictment charges that the patient received the information from her insider husband "in a relationship of trust and confidence." Indictment, ¶ 12.

In my previous opinion, I considered the decision of the Second Circuit in *United States of America v. Robert Chestman*, 903 F.2d 75 (2d Cir.1990) (*"Chestman I"*). The Second Circuit has reconsidered *Chestman I*, and recently issued an *in banc* decision, *United States of America v. Robert Chestman*, 947 F.2d 551 (2d Cir.1991) (*"Chestman II"*). Defendant grounds this motion on his contention that *Chestman II* requires dismissal of the indictment.

---

1. Before considering this motion, I granted defendant's motion for leave to withdraw his plea of guilty, and defendant has withdrawn that plea.

Thus, the only issue now before me is the effect of *Chestman II* on the indictment in this case. *Chestman II* was not decided on the face of the indictment, but rather, after a trial at which the facts were fully developed. I turn first to the facts proved in that case as stated in the majority opinion of the Second Circuit.

### THE FACTS OF CHESTMAN II

Robert Chestman is a stockbroker. Keith Loeb first sought Chestman's services in 1982, when Loeb decided to consolidate his and his wife's holdings in Waldbaum, Inc. (Waldbaum), a publicly traded company that owned a large supermarket chain. During their initial meeting, Loeb told Chestman that his wife was a granddaughter of Julia Waldbaum, a member of the board of directors of Waldbaum and the wife of its founder. Julia Waldbaum also was the mother of Ira Waldbaum, the president and controlling shareholder of Waldbaum. From 1982 to 1986, Chestman executed several transactions involving Waldbaum restricted and common stock for Keith Loeb. To facilitate some of these trades, Loeb sent Chestman a copy of his wife's birth certificate, which indicated that his wife's mother was Shirley Waldbaum Witkin.

On November 21, 1986, Ira Waldbaum agreed to sell Waldbaum to the Great Atlantic and Pacific Tea Company (A & P). The resulting stock purchase agreement required Ira to tender a controlling block of Waldbaum shares to A & P at a price of $50 per share. Ira told three of his children, all employees of Waldbaum, about the pending sale two days later, admonishing them to keep the news quiet until a public announcement. He also told his sister, Shirley Witkin, and nephew, Robert Karin, about the sale, and offered to tender their shares along with his controlling block of shares to enable them to avoid the administrative difficulty of tendering after the public announcement. He cautioned them "that [the sale was] not to be discussed," that it was to remain confidential.

In spite of Ira's counsel, Shirley told her daughter, Susan Loeb, on November 24 that Ira was selling the company. Shirley warned Susan not to tell anyone except her husband, Keith Loeb, because disclosure could ruin the sale. The next day, Susan told her husband about the pending tender offer and cautioned him not to tell anyone because "it could possibly ruin the sale."

The following day, November 26, Keith Loeb telephoned Robert Chestman at 8:59 a.m. Unable to reach Chestman, Loeb left a message asking Chestman to call him "ASAP." According to Loeb, he later spoke with Chestman between 9:00 a.m. and 10:30 a.m. that morning and told Chestman that he had "some definite, some accurate information" that Waldbaum was about to be sold at a "substantially higher" price than its market value. Loeb asked Chestman several times what he thought Loeb should do. Chestman responded that he could not advise Loeb what to do "in a situation like this" and that Loeb would have to make up his own mind.

That morning Chestman executed several purchases of Waldbaum stock. At 9:49 a.m., he bought 3,000 shares for his own account at $24.65 per share. Between 11:31 a.m. and 12:35 p.m., he purchased an additional 8,000 shares for his clients' discretionary accounts at prices ranging from $25.75 to $26.00 per share. One of the discretionary accounts was the Loeb account, for which Chestman bought 1,000 shares.

Before the market closed at 4:00 p.m., Loeb claims that he telephoned Chestman a second time. During their conversation Loeb again pressed Chestman for advice. Chestman repeated that he could not advise Loeb "in a situation like this," but then said that, based on his research, Waldbaum was a "buy." Loeb subsequently ordered 1,000 shares of Waldbaum stock.

*Chestman II*, 947 F.2d at 555.

Based on the foregoing evidence, the Second Circuit reversed Chestman's conviction for aiding and abetting Loeb's misappropriation from his wife of material, nonpublic information.

208

## DOCTOR WILLIS' ARGUMENT IN THIS CASE

Doctor Willis advances two arguments in support of his motion. First, he contends that the relationship between the patient and her insider husband was not a relationship of "trust and confidence" as alleged in the indictment because in *Chestman II,* the Second Circuit said that "marriage does not, without more, create a fiduciary relationship." *Chestman II,* 947 F.2d at 568. From this premise, he argues that there must be an unbroken chain of confidentiality, and that once the chain is broken by disclosure by an insider to a person who is not in a fiduciary relationship to him, a person who subsequently receives the information in a fiduciary capacity cannot be liable as a misappropriator, even if he trades on the information in breach of his duty of trust and confidence. Secondly, Doctor Willis argues that the misappropriation theory has been limited to fiduciary relationships that exist within the context of shareholder relations or implicate the securities markets. He takes the position that the physician-patient relationship is not a fiduciary relationship for purposes of the misappropriation theory of securities fraud. This second contention was urged by Dr. Willis in support of his previous motions to dismiss the indictment, and was rejected in my previous opinion, 737 F.Supp. at 274. He renews the argument on the ground that *Chestman II* has somehow changed the law on that question.

## DISCUSSION

I. *The relationship between husband and wife*

■ Defendant is correct that under *Chestman II,* the marital relationship is not necessarily a fiduciary relationship for purposes of the misappropriation theory. But *Chestman II* was decided on a fully developed record after trial, and not on the face of the indictment. *Chestman II* held that the evidence in that case was insufficient to show the required relationship of trust and confidence. *Chestman II,* 947 F.2d at 571. The indictment in this case expressly alleges that the patient received material, non-public information "in a relationship of trust and confidence." Under this allegation, the government is entitled to prove the requisite fiduciary relationship. *Chestman II* does not change the law that the government need not plead evidence in the indictment. *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); *Mims v. United States,* 332 F.2d 944, 946 (10th Cir.1964) ("The government is not required to plead the factual details of the offense in the indictment."). Nor are the cases cited by defendant to the contrary. Thus, *Chestman II* does not preclude the government from proving under this indictment that Mrs. Weill received the information from her husband in a relationship of trust and confidence. For as the Second Circuit pointed out, "spouses certainly may by their conduct become fiduciaries...." *Chestman II,* 947 F.2d at 568. The government represented at oral argument that it can prove conduct by the Weills that meets the standard of *Chestman II.* Tr. of November 15, 1991 at 28.

■ In any event, defendant provides no basis for his assertion that there must be an unbroken chain of confidentiality. He does not, and cannot, argue that Mrs. Weill's information did not remain material and nonpublic even if Mrs. Weill was free to trade on it. In that respect, this case is indistinguishable from *United States v. Carpenter,* 791 F.2d 1024 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). In *Carpenter,* the Second Circuit held that for purposes of the misappropriation theory of securities fraud, the critical relationship is the one between the misappropriator and the person to whom the misappropriator owes a fiduciary duty, and not the relationship between such person and any insider source of the information. In *Carpenter,* the employer, *The Wall Street Journal,* was free to trade on the information that its faithless employee misappropriated from it. Nevertheless, the Second Circuit concluded that the employee who breached his duty to preserve the confidentiality of his employer's information was criminally liable for securities fraud. The teaching of *Carpenter* is that the only

significant relationship for purposes of the misappropriation theory is the relationship between the misappropriator and the person to whom he owes an obligation of confidentiality. In *Chestman*, the misappropriator was Keith Loeb. Therefore, the nature of the relationship between Keith Loeb and his wife was critical. In this case, the analogous relationship is that between Doctor Willis and his confiding patient, and not the relationship between the patient and her husband. Indeed, in its reference to this case, the Court of Appeals described it as one in which a psychiatrist traded on the basis of information obtained from a patient in breach of a duty arising from a relationship of trust and confidence. *Chestman II*, 947 F.2d at 566.

## II. *Is Doctor Willis a fiduciary who meets the test of Chestman II?*

In *Chestman II*, the majority opinion analyzed a fiduciary relationship or its functional equivalent for purposes of the misappropriation theory as follows:

A fiduciary relationship involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests. In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use. What has been said of an agent's duty of confidentiality applies with equal force to other fiduciary relations: "an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency." Restatement (Second) of Agency § 395 (1958). These characteristics represent the measure of the paradigmatic fiduciary relationship. A similar relationship of trust and confidence consequently must share these qualities.

947 F.2d at 569.

The relationship between a psychiatrist and patient has all the characteristics of what the Court calls a "paradigmatic fiduciary relationship." *Id.* at 569. The patient depends on the psychiatrist to serve her interests. In relying on a psychiatrist to act for her benefit, the patient may entrust the psychiatrist with custody over material, nonpublic information which the psychiatrist becomes duty-bound not to appropriate for his own use. A psychiatrist is subject to a duty to his patient not to use or communicate information acquired during the course of treatment. As discussed in my prior opinion, the patient has a property interest in a continuing course of psychiatric treatment. 737 F.Supp. at 274. Mrs. Weill had an additional economic interest in preserving the confidentiality of the information that Dr. Willis appropriated for his own use. Premature disclosure might have jeopardized her husband's advancement to CEO of BankAmerica, an occurrence in which she had a financial stake.

In *Chestman II*, the Court sets out a non-exhaustive list of inherently fiduciary relationships. 947 F.2d at 568. To the extent that the majority opinion expresses concern about the misappropriation theory, it is a concern about amorphous relationships of trust and confidence that are not inherently fiduciary and well-recognized as such. A treating psychiatrist's relationship to his patient is a traditional inherently fiduciary relationship. 737 F.Supp. at 272. I find nothing in *Chestman II* that suggests otherwise.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the indictment is denied.

A scheduling conference shall be held on December 6, 1991 at 12:30 p.m. to set a date for trial.

SO ORDERED.